USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1276 CPC INTERNATIONAL, INC., Plaintiff - Appellant, v. NORTHBROOK EXCESS & SURPLUS INSURANCE COMPANY, Defendant - Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Ronald R. Lagueux, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Bownes, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ _____________________ Jerome P. Facher, with whom Michelle D. Miller, Nicholas _________________ ___________________ ________ Carter, Hale and Dorr, David L. Harris, Geoffrey A. Price and ______ ______________ _______________ __________________ Lowenstein, Sandler, Kohl, Fisher & Boylan were on brief for _____________________________________________ appellant. Philip J. McGuire, with whom Douglas G. Shreffler, Gleason, __________________ ____________________ ________ McGuire & Shreffler, Kenneth P. Borden, Higgins, Cavanaugh & ____________________ __________________ _____________________ Cooney, Stephen W. Miller, James B. Burns and Clark, Ladner, ______ _________________ _______________ _______________ Fortenbaugh & Young were on brief for appellee. ___________________ ____________________ January 25, 1995 ____________________ TORRUELLA, Chief Judge. Plaintiff-appellant, CPC TORRUELLA, Chief Judge. ____________ International, Inc. ("CPC"), filed this action seeking a declaration that defendant-appellee, Northbrook Excess & Surplus Insurance Company ("Northbrook"), is obligated to indemnify it for environmental cleanup costs related to land and water contamination allegedly caused by Peterson/Puritan, Inc. ("Peterson/Puritan"), a former subsidiary of CPC. At the close of CPC's evidence in the jury trial of the case, the district court granted Northbrook's motion, pursuant to Fed. R. Civ. P. 50(a), for judgment as a matter of law. CPC appeals 1) the district court's pretrial choice-of-law decision predicting that a New Jersey court would apply the substantive law of Rhode Island and 2) the district court's grant of judgment as a matter of law. For the reasons stated herein, we affirm the district court's choice-of-law decision and certify a question to the Rhode Island Supreme Court. I. I. BACKGROUND BACKGROUND A. Factual Background A. Factual Background __________________ The ultimate issue in this case is whether Northbrook is obligated to indemnify CPC for environmental cleanup costs related to land and water contamination caused by Peterson/Puritan, an aerosol packaging plant formerly owned by CPC. CPC is a multinational packaging and manufacturing corporation headquartered in New Jersey. From July 1, 1979 to July 1, 1980, Northbrook served as CPC's first layer excess -2- insurance carrier, with a $25 million umbrella liability policy. In 1968, CPC acquired the Puritan Aerosol Company and renamed it Peterson/Puritan. Peterson/Puritan manufactures, among other things, flea spray, hair spray, spot remover and oven cleaner. Its manufacturing facility is located in the town of Cumberland, Rhode Island, on a seventeen-acre site ("the Peterson-Puritan site") fronted on its western side by the Blackstone River. In 1979, both Cumberland and the neighboring town of Lincoln discovered chemical contamination in their municipal water supplies, the Quinnville Wellfields. The wells were closed later that year. In 1980, the United States Environmental Protection Agency ("EPA") hired the environmental engineering firm Goldberg- Zoino and Associates to conduct a hydrogeological study of the aquifer underlying the Blackstone River (the "GZA Report"). In 1982, based on the results of the GZA Report, the Town of Lincoln sued Peterson/Puritan for contamination of the Quinnville Wells. That suit was settled in 1984 for $780,000. The settlement was paid by Northwestern National Insurance Company ("Northwestern National"), CPC's primary insurance carrier, under a policy with a coverage limit of $1 million. In 1983, EPA placed an area including the Peterson/Puritan site and the aquifer east of the Blackstone River (designated by the EPA as "OU-1") on its National Priorities List. In 1987, following several years of negotiations, EPA issued an Administrative Order by Consent, -3- pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. 9601 et __ seq., which identified Peterson/Puritan as the party responsible ___ for numerous hazardous chemicals migrating into the groundwater, and ordered Peterson/Puritan to investigate additional responsible parties and further analyze site conditions. Later that year, Northwestern National informed CPC and Northbrook that the primary insurance policy was exhausted, thus bringing Northbrook into the fold.1 In July of 1987, CPC filed suit against Northbrook in New Jersey state court seeking a declaration that Northbrook is obligated to indemnify it for environmental cleanup costs and damages arising from the Town of Lincoln settlement and the EPA- ordered cleanup. On the basis of diversity jurisdiction, Northbrook removed the case to the United States District Court for the District of New Jersey. In 1989, the New Jersey district court granted Northbrook's motion to transfer venue to the United States District Court for the District of Rhode Island. After the transfer, CPC filed a motion for a declaration that the substantive law of New Jersey governs this litigation. In an Opinion dated June 21, 1990, the Rhode Island district court concluded, first, that in ruling upon the choice-  ____________________ 1 In May of 1987, CPC agreed to sell Peterson/Puritan to Hi-Port Industries, Inc., a Texas corporation. As part of that agreement, Peterson/Puritan assigned to CPC its rights to claims under any insurance policy for expenses already paid by CPC in connection with the environmental contamination claims against Peterson/Puritan. -4- of-law issue it must apply the law of the state which would have been applied had the change of venue not occurred and, second, that a New Jersey court would apply New Jersey law to this case because, as the home base of the insured, CPC, it has the most significant interest in the outcome of the case. CPC Int'l, Inc. _______________ v. Northbrook Excess & Surplus Ins. Co., 739 F. Supp. 710, 713-15 ____________________________________ (D.R.I. 1990). The parties filed cross-motions for summary judgment and, on March 15, 1991, the district court denied CPC's motion for summary judgment and allowed Northbrook's cross-motion on the ground that the pollution exclusion clause in Northbrook's policy precluded coverage for gradual pollution. The district court concluded that CPC failed to sustain its burden of establishing a genuine issue of fact with respect to whether the contamination of the aquifer was "sudden and accidental," within the meaning of New Jersey law, and therefore held that the pollution exclusion applied. CPC Int'l, Inc. v. Northbrook Excess & Surplus Ins. ________________ __________________________________ Co., 759 F. Supp. 966, 976 (D.R.I. 1991). ___ CPC appealed and, on March 24, 1992, we reversed the district court's grant of summary judgment for Northbrook and remanded the case to the district court. We concluded that, in predicting how the New Jersey Supreme Court would interpret the "sudden and accidental" provision, the district court gave insufficient weight to decisions of the New Jersey Superior Court's Appellate Division (New Jersey's intermediate appellate court), which had concluded that the "sudden and accidental" -5- provision is ambiguous and had interpreted it favorably to insureds as providing coverage for gradual pollution. See CPC ___ ___ Int'l, Inc. v. Northbrook Excess and Surplus Ins. Co., 962 F.2d ___________ _______________________________________ 77, 97-98, reh'g denied, 962 F.2d 98 (1st Cir. 1992).2 ____________ After the case was remanded, Northbrook moved for reconsideration of the district court's 1990 choice-of-law decision. In a Memorandum and Order dated December 16, 1993 (the "Second Choice-of-Law Decision"), the district court granted Northbrook's motion, holding that the substantive law of Rhode Island would henceforth govern the case. We denied CPC's petition for mandamus. The case went to trial on January 28, 1994. Over eleven days, CPC offered testimony from several witnesses, including three experts, and employees of the former Peterson/Puritan facility. At the close of CPC's evidence, Northbrook moved for judgment as a matter of law under Fed. R. Civ. P. 50(a). On February 16, 1994, the district court delivered a detailed oral opinion concluding that CPC had failed to present evidence from which a reasonable jury could conclude that there was an "occurrence" -- an event resulting in property damage -- during the policy period. The district court therefore ________________________ granted Northbrook's motion for judgment as a matter of law.  ____________________ 2 Because the New Jersey Supreme Court had never interpreted the "sudden and accidental" provision, and New Jersey does not have a procedure for certification of questions, the district court based its decision on its interpretation of decisions from New Jersey's trial and appellate courts, and general principles of contract interpretation gleaned from a review of New Jersey Supreme Court cases. See generally CPC Int'l, 759 F. Supp. 966. _____________ __________ -6- This appeal followed. II. II. STANDARD OF REVIEW STANDARD OF REVIEW We review the district court's choice-of-law decision de novo. See Crellin Technologies, Inc. v. Equipmentlease Corp., __ ____ ___ __________________________ ____________________ 18 F.3d 1, 4 (1st Cir. 1994). With respect to the district court's grant of judgment as a matter of law, we note, at the outset, that judgment as a matter of law is proper at the close of the plaintiffs' case only when, after scrutinizing plaintiffs' evidence and the inferences reasonably to be drawn therefrom in the light most favorable to the plaintiffs, the trial court concludes that no reasonable jury could find in plaintiffs' favor on any permissible claim or theory. Rol n-Alvarado v. ______________ Municipality of San Juan, 1 F.3d 74, 76 (1st Cir. 1993). ___________________________ Judgment as a matter of law may be entered only if the evidence, viewed from this perspective, is such that reasonable minds could not differ as to the outcome. Id.  __ We review the Rule 50(a) motion decision de novo, see __ ____ ___ Salve Regina Coll. v. Russell, 499 U.S. 225, 231-32, 111 S. Ct. __________________ _______ 1217, 113 L.Ed.2d 190 (1990); Jordan-Milton Mach., Inc. v. F/V _________________________ ___ Teresa Marie, II, 978 F.2d 32, 34 (1st Cir. 1992), under the same ________________ standards governing the district court, Rol n-Alvarado, 1 F.3d at ______________ 76, with a view to the legal sufficiency of the evidence presented by the plaintiffs. III. III. DISCUSSION DISCUSSION -7- CPC contends that the district court erred, first, in determining that Rhode Island law would govern the case, after previously determining that New Jersey law would govern, and, second, in concluding that CPC had failed to present evidence from which a reasonable jury could find in its favor.3 A. Choice of Law A. Choice of Law _____________ CPC asserts that the district court erred in changing its original choice-of-law determination. CPC makes two related arguments in support of this assertion. First, CPC contends that the district court violated the "law of the case" doctrine in changing its original choice-of-law ruling. Second, CPC maintains that the district court's second choice-of-law ruling was erroneous -- i.e., that a New Jersey court would not apply the substantive law of Rhode Island to this case. In its original choice-of-law decision, the district court ruled that a New Jersey court would apply the substantive law of New Jersey to the facts of this case. The court concluded that, under New Jersey's choice-of-law rules, New Jersey, as the location of the insured, has the strongest interest in the outcome of the case. The court rejected Northbrook's contention that the substantive law of Rhode Island, the site of the contamination, or, in the alternative, the law of Illinois, the state in which the insurer accepted the risk, should apply.  ____________________ 3 CPC also maintains that the district court erred in deciding the case on "general principles of law," rather than the law of New Jersey or Rhode Island. We address this contention with our discussion of the merits of the case. -8- Northbrook sought, unsuccessfully, to have the choice-of-law question certified to this court. The district court then granted Northbrook's motion for summary judgment under New Jersey law. In reversing the district court's summary judgment ruling, we noted that the district court's June 21, 1990 choice- of-law decision that New Jersey law governs was not questioned on appeal and that, therefore, it "is law of the case." CPC Int'l, _________ 962 F.2d at 91. We rejected Northbrook's petition for rehearing on the choice-of-law issue, concluding that Northbrook did not preserve the issue on appeal. After the case was remanded, Northbrook filed a motion requesting that the district court reconsider its previous choice-of-law ruling. In its Second Choice-of-Law Decision, the district court made two related rulings. First, the district court decided that the New Jersey Supreme Court's recent decision in Gilbert Spruance Co. v. Pennsylvania Manufacturers' Ass'n _______________________ ____________________________________ Insurance Co., 629 A.2d 885 (N.J. 1993), represents "a clear and _____________ contrary change in the law applicable to the case" and, therefore, that "the law of the case presumption is overcome." Second, the court held that a New Jersey court, applying the newly articulated principles of Gilbert Spruance, would apply the ________________ substantive law of Rhode Island to the facts of this case and, therefore, that Rhode Island law, rather than New Jersey law, would govern this litigation. As noted previously, under normal circumstances we -9- review de novo a district court's choice of the substantive law __ ____ to apply in a particular case. In this case, however, an additional consideration guides our review of the district court's choice-of law decision. Under the "law of the case" doctrine, a decision by an appellate court on a particular issue, unless vacated or set aside, governs the issue during all subsequent stages of the litigation. United States v. Rivera- ______________ _______ Mart nez, 931 F.2d 148, 151 (1st Cir.), cert. denied, ___ U.S. ________ ____ ______ ___, 112 S. Ct. 184, 116 L.Ed.2d 145 (1991). The law of the case doctrine bars litigants from rearguing issues previously decided on appeal. See, e.g., United States v. Rosen, 929 F.2d 839, 842 ___ ____ _____________ _____ n.5 (1st Cir.), cert. denied, ___ U.S. ___, 112 S. Ct. 77, 116 ____ ______ L.Ed.2d 51 (1991); United States v. De Jes s, 752 F.2d 640, 642- _____________ ________ 43 (1st Cir. 1985); White v. Martha, 377 F.2d 428, 431 (5th Cir. _____ ______ 1967). The doctrine is based on considerations of "stability in the decisionmaking process, predictability of results, proper working relationships between trial and appellate courts, and judicial economy." United States v. Connell, 6 F.3d 27, 30 (1st ______________ _______ Cir. 1993). Under the law of the case doctrine, when a trial court, on remand, seeks to dispose of a case in accordance with an appellate court's mandate, it "'must implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces.'" Id. __ (quoting United States v. Kikumura, 947 F.2d 72, 76 (3d Cir. _____________ ________ 1991)). The law of the case was not intended, however, to serve -10- as an absolute bar to reconsideration, nor a limitation on a federal court's power. Rivera-Mart nez, 931 F.2d at 151. We _______________ have, therefore, recognized that a district court may, as an exception to the law of the case doctrine, reexamine a previous ruling when "controlling authority has since made a contrary decision of the law applicable to such issues. . . ." Id.4 CPC __ argues that the New Jersey Supreme Court's decision in Gilbert _______ Spruance does not represent "a contrary decision of the law ________ applicable" to the district court's original choice-of-law decision. We agree with the district court's conclusion that Gilbert Spruance represents a decision which is contrary to the _________________ law as applied by the district court in its original choice-of- law decision. We also think that, although Gilbert Spruance does ________________ not necessarily mandate the decision reached by the district _______ court, it certainly provides ample support for the district court's prediction that the New Jersey Supreme Court, if faced with the question, would conclude that Rhode Island law should govern this dispute. In its original choice-of-law ruling, the district court analyzed a host of decisions by the New Jersey Appellate Division. The district court also reviewed what was, at the  ____________________ 4 Under the law of the case doctrine, issues once decided should not be reopened "'unless the evidence on a subsequent trial was subsequently different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice.'" Rivera-Mart nez, 931 F.2d at 151 (quoting White v. _______________ _____ Martha, 377 F.2d 428, 432 (5th Cir. 1967)). ______ -11- time, the New Jersey Supreme Court's most recent decision concerning choice-of-law in the liability-insurance context -- State Farm Mut. Auto. Ins. Co. v. Estate of Simmons, 84 N.J. 28, ______________________________ _________________ 417 A.2d 488 (1980) -- and predicted that a New Jersey court would consider New Jersey, the location of the insured's principal headquarters, the state with the strongest interest in the outcome of the case. In eliminating the law of Rhode Island as a possibility, the district court relied on the Appellate Division's decision in Westinghouse Elec. Corp. v. Liberty Mut. ________________________ ____________ Ins. Co., 233 N.J.Super. 463, 559 A.2d 435 (App.Div. 1989), which ________ adopted the "uniform-contract-interpretation" approach to choice- of-law determinations. Under that approach, policy interpretation should be uniform nationwide and not vary according to the location of the risk. At the time of the district court's first choice-of-law opinion, State Farm was the controlling decision of the New ___________ Jersey Supreme Court with respect to choice-of-law issues in the liability-insurance context. State Farm held that, because the __________ law of the place of contract "generally comport[s] with the reasonable expectations of the parties concerning the principal situs of the insured risk," that state's law should be applied "unless the dominant and significant relationship of another state to the parties and the underlying issue dictates that this basic rule should yield." State Farm, 84 N.J. at 37. State Farm __________ __________ directs courts, in making that determination, to rely on the factors and contacts set forth in sections 6 and 188 of -12- Restatement (Second) of Conflicts of Laws (1971). Id. at 34- __ 35.5 Thus, State Farm creates a rebuttable presumption that the __________ law of the state where the contract was entered into will govern the dispute. See J. Josephson, Inc. v. Crum & Forster Ins. Co., ___ __________________ ________________________ 265 N.J.Super. 230, 239, 626 A.2d 81, 86 (App.Div. 1993). Gilbert Spruance changes the presumption by rejecting ________________ the "uniform-contract-interpretation approach" and adopting the "site-specific" approach to choice-of-law determinations in the casualty-insurance context. See Gilbert Spruance, 134 N.J. at ___ ________________ 111-14. The New Jersey Supreme Court now directs courts to look, first, to section 193 of Restatement (Second) of Conflicts of Laws, which sets forth the site-specific rule by creating a presumption that a casualty-insurance policy be interpreted under the substantive law of the state that "the parties understood was to be the principal location of the insured risk, unless some other state has a more significant relationship" to the parties, the transaction, and the outcome of the controversy under a Restatement section 6 analysis. Gilbert Spruance, 134 N.J. at _________________ 111 (quoting Restatement (Second) of Conflicts of Laws 193).  ____________________ 5 Restatement (Second) of Conflict of Laws 188 provides that the general rule in contract actions is that the law of the state with the most significant relationship to the parties and the transaction under the principles stated in Restatement 6 governs. Section 6 lists several factors to be considered in a choice-of-law analysis: 1) the relevant policies of the forum; 2) the relevant policies of other interested states; 3) the protection of justified expectations; 4) the basic policies underlying the particular field; 5) the needs of the interstate and international systems; 6) certainty, predictability, and uniformity of result; and 7) the ease in determination and application of the law applied. -13- Gilbert Spruance also provides that when the subject matter of ________________ the insurance is a predictably multistate operation or activity, "the significance of the principal location of the insured risk diminishes," and "the governing law is that of the state with the dominant significant relationship according to the principles set forth in Restatement section 6." Id. (citations omitted). __ The Gilbert Spruance decision resolved a conflict among ________________ different panels of New Jersey's Appellate Division by specifically rejecting the "uniform-contract-interpretation approach" to choice-of-law determinations and adopting the "site- specific" approach. Compare Westinghouse, 559 A.2d 435; with _______ ____________ ____ Diamond Shamrock Chemicals Co. v. Aetna Cas. & Surety Co., 258 _______________________________ _______________________ N.J.Super. 167, 609 A.2d 440 (App.Div. 1992) (interest of state where pollution site lies is "more dominant and significant"); Johnson Matthey, Inc. v. Pennsylvania Mfrs. Ass'n Ins. Co., 250 _____________________ __________________________________ N.J.Super 51, 593 A.2d 367 (App.Div. 1991) (interest of state where pollution site lies is "paramount"). In its initial choice-of-law ruling, the district court relied on the reasoning behind the Westinghouse court's adoption of the uniform-contract- ____________ interpretation approach in determining that the law of Rhode Island, the location of the risk, should not govern this case. CPC Int'l, 739 F. Supp. at 714. The Gilbert Spruance court's _________ _________________ rejection of the uniform-contract-interpretation is therefore a highly significant change in the controlling authority. It changes the equation upon which the district court relied in making its initial choice of law decision. The district court was -14- obligated to predict which state's substantive law the New Jersey Supreme Court would apply to the facts of this case, a task made all the more difficult because New Jersey does not have a procedure for certifying questions. In our view, the principles announced by the New Jersey Supreme Court represent a significant change in the law applicable to the district court's choice-of- law decision. We conclude, therefore, that the district court's departure from the law of the case was justified. We also conclude, on de novo review, that the district __ ____ court's prediction that the New Jersey Supreme Court would apply the law of Rhode Island in this case is supported by New Jersey case law, particularly the principles announced in Gilbert _______ Spruance. Under the site-specific rule adopted by Gilbert ________ _______ Spruance, it is presumed that the substantive law of the state ________ which is the principal location of the insured risk governs, unless another state has a more significant overall interest in the case. Gilbert Spruance, 134 N.J. at 112. New Jersey's only ________________ connection with the case is that CPC's headquarters are located in New Jersey. Moreover, Gilbert Spruance explained that "[w]hen ________________ the waste-producing facility and the waste site are located in the same state, their common location makes the application of [the Restatement's choice-of-law factors] straightforward." Id. __ at 107. As the district court noted, in this case the waste was both generated and disposed of in Rhode Island. CPC argues that Gilbert Spruance explicitly left open ________________ the question of whose law would apply in a case such as this. -15- CPC cites the following language in support of this proposition. We have no occasion to consider in this appeal the problem presented when waste generated in New Jersey predictably is disposed of in another state. . . . Specifically, we express no view on the proposition . . . that when another state is the foreseeable location of the waste- site, the court must engage in a section 6 analysis to determine if that state has the most significant relationship with [the case]. Id. at 113-14. In our view, this language merely leaves open the __ possibility that when waste is generated in New Jersey and _________________________ disposed of in another state, New Jersey law might still apply. As noted, in this case, the waste was both generated and disposed ____ of in Rhode Island. Under such circumstances, there is every reason to predict that the New Jersey Supreme Court would recognize with equal vigilance the "urgent concern for the health and safety of [Rhode Island's] citizens" implicated by the generation and dumping of toxic waste in that state. See id. at ___ __ 113 (quoting Johnson Matthey, 250 N.J.Super. at 57. _______________ For the foregoing reasons, we affirm the district court's decision that the New Jersey Supreme Court would apply the substantive law of Rhode Island in this case. We now turn to the merits of this appeal -- the district court's decision granting Northbrook's motion for judgment as a matter of law. B. The Grant of Judgment as a Matter of Law B. The Grant of Judgment as a Matter of Law ________________________________________ 1. The Policy Provisions 1. The Policy Provisions _____________________ Northbrook issued a comprehensive liability policy to CPC which was in effect from July 1, 1979 through July 1, 1980. -16- Pursuant to that policy, Northbrook agreed to indemnify CPC for personal injuries, property damage and/or advertising liability "caused by or arising out of each Occurrence happening anywhere in the world." The policy defines "property damage" as "loss of or direct damage to or destruction of tangible property (other than property owned by an insured) and which results in an Occurrence during the policy period." The policy defines "Occurrence" as: an accident, event or happening including continuous or repeated exposure to conditions which results, during the policy period, in Personal Injury, Property Damage or Advertising Liability neither expected nor intended from the standpoint of the Insured . . . . All such Personal Injury, Property Damage or Advertising Injury caused by one event or repeated exposure to substantially the same conditions shall be deemed to result from one Occurrence. 2. The District Court Decision 2. The District Court Decision ___________________________ In ruling upon Northbrook's motion for judgment as a matter of law, the district court made the following pertinent findings of fact. Between 1963 and the late 1970s, Peterson/Puritan polluted the environment in the area of its plant in Cumberland, Rhode Island. Peterson/Puritan employees routinely dumped chemicals, including volatile organic compounds ("VOCs"), into the drain and septic systems. In 1974, a railroad tank container at Peterson/Puritan spilled causing approximately 6,200 gallons of the solvent perchloroethylene to spill onto and into the soil (the "1974 PERC spill"). -17- The theory of the case presented by CPC at trial, primarily through the testimony of two expert witnesses, was that prior to the 1974 PERC spill, the VOCs dumped from Peterson/Puritan were in the soil but, because of the presence of silt and clay, had not reached groundwater. In other words, they were stagnant. Dr. Tod Delaney testified that the PERC spill mobilized these VOCs in the soil and led them into the groundwater and, eventually, the combined force travelled a several thousand foot path to the Quinnville Wells. Dr. Delaney testified that, but for the 1974 PERC spill, there would have been no pollution of the Quinnville Wells. Dr. Delaney also testified that the leading edge of the 1974 PERC spill reached and contaminated the Quinnville Wells in 1979, during the policy period. Pollution of the Quinnville Wellfields was discovered in October 1979, during the policy period. In its detailed oral opinion granting judgment as a matter of law for Northbrook, the district court reasoned that, because the policy was only in effect from July 1, 1979 to July 1, 1980, the burden at trial was upon CPC to present evidence from which a reasonable jury could infer that there was an "occurrence" during that period. The district court stated that CPC's theory at trial was that because the EPA desires to reopen the Quinnville Wells, and cleaning the aquifer is directly related to that goal, the "occurrence" for purposes of insurance should be measured by when the contamination of the wells occurred. The difficulty with -18- this theory, as the district court explained, is that the Town of Lincoln's claim against Peterson/Puritan to clean up the Quinnville Wells had been settled in 1984 and Northwood had paid the settlement under its insurance policy. The present action concerns the EPA's claims against CPC regarding the aquifer east of the Blackstone River -- the area designated by the EPA as OU-1 -- not the Quinnville Wells. The district court stated that whatever the EPA's motivations concerning reactivating the Quinnville Wells in the future may be, "the fact of the matter is that the area being remediated is east of the Blackstone River." The court then concluded that the "occurrence" in this case took place before the policy became effective. The plaintiff seeks to recover the costs of remediation of the aquifer east of the Blackstone River from this defendant. The evidence is clear in this case from the experts presented by the plaintiff, that the aquifer was damaged within the ____________________________________ meaning of the policy when it was _________________________________________ polluted by the PERC spill in 1974 within _________________________________________ days or at best, weeks of June 21, 1974 _________________________________________ when this PERC spill took place, five __________________________________ years or more before July 1, 1979 when this policy took effect. Because it found that the "occurrence" took place before the policy came into effect, the district court concluded that, as a matter of law, Northbrook was not obligated to indemnify CPC. The district court explained that: If there is a principle of insurance law that means anything it is the principle that insurance protects a policyholder against future contingent events. It is not for the purpose of providing -19- compensation for events that have already taken place, and that is so under the law of New Jersey, Rhode Island, the First Circuit, or any other jurisdiction within the United States. So, simply on that ground alone, the occurrence in this case clearly took place before the policy became effective, there can be no recovery of the remediation costs from this insurance carrier. The district court also rejected CPC's case for another reason. The court, accepting arguendo CPC's theory that ________ remediation of the aquifer is tied in with reopening the Quinnville Wells, concluded that CPC had failed to sustain its burden of showing that damage to the Quinnville Wells took place during the policy period. Dr. Willard Murray testified that, depending upon the undetermined porosity of the soil, the leading edge of the PERC plume reached the Quinnville Wells between October or November 1978, and December 1981. Reviewing that testimony, the district court noted that it is "just as probable that that army of VOC's led by the PERC arrived at the Quinnville Wells in 1978 or early 1979 as it is that it arrived after July 1, 1979." The district court therefore concluded that "[n]o jury could find that this pollution plume arrived at the Quinnville Wells after July 1, 1979 without completely speculating." The district court held that there is "no possibility" that CPC could recover from Northbrook for the costs of remediation of the OU-1 area and, therefore, granted Northbrook's motion. In conclusion, the court stated that "[t]his case is being decided on general principles of law and it really doesn't matter whose law applies in this case." -20- By declining to look specifically to the controlling law in this case, the law of Rhode Island, the district court essentially held that, under general principles of insurance law, there is one trigger date for calculating the time when an "occurrence" causing "property damage" takes place; or, at least that, if there is more than one possible trigger date, CPC could not recover under any of them. In fact, there are at least seven trigger dates utilized by different jurisdictions for determining the time at which an occurrence causing property damage takes place.6 Moreover, as discussed below, CPC could possibly recover under one or more of these theories. Thus, it is critical to determine which trigger theory of coverage Rhode Island would apply to this case. As noted, there are at least seven theories used in different jurisdictions for determining when an occurrence policy provision is triggered. See generally In re Acushnet River & New _____________ __________________________ Bedford Harbor: Proceedings Re Alleged PCB Pollution, 725 F. ________________________________________________________ Supp. 1264, 1274-75 (D.Mass. 1989) (describing the seven standards), aff'd in part and rev'd in part on other grounds sub _____________________________________________________ nom., Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc., 938 ____ _________________________ ________________________ F.2d 1423 (1st Cir. 1991), cert. denied, ___ U.S. ___, 112 S. Ct. ____________ 969, 117 L.Ed.2d 134 (1992). These seven theories or standards are as follows.  ____________________ 6 These different legal standards are critical because, as is the case here, most, if not all, "occurrence" policy provisions only allow recovery for an occurrence causing property damage during the policy period. -21- First, the wrongful act theory would hold that the occurrence causing property damage took place when the 1974 PERC spill occurred. Second, the exposure theory would hold that the occurrence causing property damage took place when the VOCs leeched into the environment. See Continental Ins. Co. v. ___ ______________________ Northeastern Pharmaceutical and Chem. Co., 811 F.2d 1180, 1189 ___________________________________________ (8th Cir. 1987), modified on other grounds after reh'g en banc, ______________________________________________ 842 F.2d 977 (8th Cir. 1988), cert. denied, ___ U.S. ___, 109 S. ____________ Ct. 66, 102 L.Ed.2d 43 (1988). Third, the injury-in-fact theory would hold that the occurrence causing damage to property took place when the level of VOCs was such that the aquifer was actually injured or contaminated. See American Home Products ___ _______________________ Corp. v. Liberty Mut. Ins. Co., 748 F.2d 760, 765 (2d Cir. _____ _______________________ 1984).7 Fourth, the manifestation theory would hold that the occurrence causing property damage took place when the damage became "reasonably capable of . . . diagnosis." Eagle Pitcher _____________ Indus., Inc. v. Liberty Mut. Ins. Co., 682 F.2d 12, 25 (1st Cir. ____________ _____________________ 1982) (applying the law of Ohio and Indiana), cert. denied, 460 ____________ U.S. 1028, 103 S. Ct. 1280, 75 L.Ed.2d 500 (1983); American Home _____________ Assurance Co. v. Libby-Owen-Ford Co., 786 F.2d 22, 30 (1st Cir. _____________ ___________________ 1986) (applying Ohio law). Fifth, the first discovery theory would hold that the occurrence causing damage to property took place when the property owner actually discovered the pollution.  ____________________ 7 This appears to be the theory used by the district court in its initial decision, under "general principles of law," that CPC could not recover because injury to the aquifer took place "when it was polluted by the PERC spill in 1974 within days or at best, weeks of June 21, 1974 when this PERC spill took place . . ." -22- Pittsburgh Corning Corp. v. Travelers Indem. Co., No. 84-3985, _________________________ ____________________ 1988 WL 5291 (E.D.Pa. Jan. 20, 1988). The sixth theory is a combination of the fourth and fifth. Under this theory, the occurrence causing damage to property took place when the insured "knew or should have known" of the property damage. See In re ___ _____ Acushnet, 725 F. Supp. at 1274 n.17 (citing Bartholomew v. ________ ______ ___________ Insurance Co. of North America, 502 F. Supp. 246, 252-54 __________________________________ (D.R.I.), aff'd, 655 F.2d 27 (1st Cir. 1981). Finally, the _____ continuous trigger theory would hold that the occurrence causing property damage took place both at the time of exposure and at the time of manifestation. Keene v. Insurance Co. of North _____ ________________________ America, 667 F.2d 1034, 1047 (D.C.Cir. 1981), cert. denied, 455 _______ ____________ U.S. 1007, 102 S. Ct. 1644, 71 L.Ed.2d 875 (1982). The question of which trigger theory to apply is critical in this case. If the Rhode Island Supreme Court would apply the wrongful act, exposure, or injury-in-fact theories, the district court's decision should be affirmed. If the Rhode Island Supreme Court would apply the manifestation, first discovery, or "reasonably knew or should have known" theories, the case should be remanded to the district court for a new trial. The reason for this is that, based on the testimony at trial, a reasonable jury could have found that the 1974 PERC spill caused the VOCs to migrate to the Quinnville Wells and that the PERC-led contaminants reached the wells before October -23- 1979.8 Under the manifestation theory, a reasonable jury would be entitled to infer, based on CPC's uncontroverted evidence, that the first time CPC should have known of damage to the aquifer was in October 1979, when the contamination of the Quinnville Wells was discovered.9 It follows that the same holds true for the first discovery and "knew or should have known" theories. The district court was obligated to determine which of these trigger-of-coverage theories the Rhode Island Supreme Court would apply in this case. Because it did not, we have endeavored to do so here. In the end, however, we conclude that Rhode Island law is unclear as to which trigger-of-coverage is to be applied and, therefore, choose to certify the question to the Rhode Island Supreme Court. CPC argues that Bartholomew, a case from the United ___________  ____________________ 8 The particular testimony that would support this is: 1) Dr. Delaney's testimony, that, but for the PERC spill, the Quinnville wells would not have been polluted; 2) the testimony that the pollution was discovered in October 1979; and 3) Dr. Murray's testimony that the leading edge of the PERC plume reached the Quinnville Wells between October or November 1978, and December 1981. If the jury accepted all these facts as true, which we must do on appeal, it could determine that the PERC-led pollutants, stimulated by the 1974 PERC spill, reached the wells before October 1979. 9 The district court did not make specific findings as to whether CPC (or Peterson/Puritan) reasonably should have known that the 1974 Perc spill would damage the environment, although the court did note that "the event was well recognized by the management of Peterson/Puritan." The district court also noted that it is "unfortunate that people were not environmentally tuned in at that time because, of course, Peterson/Puritan could have made a substantial claim against [the railroad carrier] for polluting the environment." -24- States District Court for Rhode Island, purporting to apply Rhode Island law, is the controlling Rhode Island precedent. Bartholomew holds that the date of the occurrence is the date ___________ when the insured "knew or should have known" of the property damage.10 Northbrook, on the other hand, maintains that the Rhode Island Supreme Court's recent decision in Textron, Inc. v. _____________ Liberty Mut. Ins. Co., 639 A.2d 1358 (R.I. 1994), indicates that _____________________ Rhode Island follows the "injury-in-fact" theory -- i.e., the date of an occurrence is the date when the property damage occurs. We agree that Bartholomew and Textron are the most apt ___________ _______ cases from Rhode Island on the trigger-of-coverage issue. Our analysis of the two cases, however, leads us to the conclusion that they raise more questions than they answer. The district court in Bartholomew, finding no Rhode ___________ Island law on the subject, predicted that the Rhode Island Supreme Court would adopt the "reasonably knew or should have known" trigger-of-coverage standard. There are several difficulties with this case as an indicator of Rhode Island law. First, our research indicates that no Rhode Island court has either explicitly adopted or rejected the Bartholomew standard; ___________ in fact, to our knowledge, no Rhode Island court has ever even  ____________________ 10 CPC actually maintains that Bartholomew establishes a ___________ "manifestation" trigger of coverage -- i.e., there is no "occurrence" under the policy until the "property damage" becomes known. Bartholomew, however, clearly holds that the date of ___________ occurrence is the date when the insured "knew, or reasonably _____________ should have known," of the injury or property damage. ____________________ Bartholomew, 502 F. Supp. at 254. Accord American Home Assur., ___________ ______ ____________________ 786 F.2d at 29 (reciting the Bartholomew test). ___________ -25- cited Bartholomew. Second, our decision affirming the district ___________ court in that case did not explicitly comment on the standard adopted by the district court, but rather relied on the more fundamental fact that the "defects were fully known, indeed sued for, before the policies took effect." Thus, we commented, "[w]e can only construe the present action as an attempt to 'job' the defendants." Bartholomew v. Appalachian Ins. Co., 655 F.2d 27, ___________ ____________________ 29 (1st Cir. 1981). Finally, and most importantly, if Bartholomew is in conflict with Textron, obviously the Rhode ___________ _______ Island Supreme Court decision controls the present diversity action. In a footnote in Textron, Inc. v. Liberty Mut. Ins. _____________ __________________ Co., 639 A.2d 1358 (1994), the Rhode Island Supreme Court made ___ the following statement. In the area of general-liability insurance, an occurrence policy provides coverage for any "occurrence" which takes place during the policy period. Under this type of policy it is irrelevant whether the resulting claim is brought against the insured during or after the policy period, as long as the injury- _________________________ causing event happens during the policy _________________________________________ period. ______ Id. at 1361 n.1 (emphasis added) (citing DiLuglio v. New England __ ________ ___________ Ins. Co., 959 F.2d 355, 358 (1st Cir. 1992) and Gereboff v. the ________ ________ ___ Home Indemnity Co., 119 R.I. 814, 818 n.1, 383 A.2d 1024, 1026 __________________ n.1 (1978)). Northbrook maintains that this statement indicates that Rhode Island looks to the point when the injury in fact occurs as the trigger date for coverage. Although we agree that it could be read that way, we have several concerns about the _____ -26- reliability of this general statement as a predictor of Rhode Island law in this case. First, the statement in Textron is entirely dictum; it _______ appears only in a very general fashion and in a footnote; and it was not relevant to decision of the case. In Textron, an insured _______ sought indemnification for property damage which allegedly occurred during the coverage period but which was not reported until twenty-one years after the last policy's expiration. The case was disposed of, in favor of the insurer, pursuant to a policy provision which required that the insured report the property damage within one year of the expiration of the policy. Textron, 639 A.2d at 1363. Thus, the outcome of the case in no _______ way depended upon the langauge in the footnote. Second, Textron does not cite Bartholomew, a case _______ ___________ purportedly applying Rhode Island law, which is cited extensively by courts in the First Circuit and other jurisdictions, and which adopts an entirely different standard. We think this raises questions as to exactly how broad a sweep the Textron court _______ intended its statement to have. Third, the phrase "injury-causing event" could (we think reasonably) be interpreted as either of three potential trigger theories. It could mean Rhode Island uses the "wrongful act theory" in its trigger of coverage analysis, which in this case would be the 1974 PERC spill. It could mean, as Northbrook argues, that Rhode Island follows the injury-in-fact theory. Here, according to CPC's own expert witnesses, the injury in fact -27- would have occurred within days of the 1974 PERC spill. Finally, it could refer to the exposure theory. In this case, that would have been when the VOCs leeched into the environment -- within minutes of the 1974 PERC spill.11 Moreover, as the Bartholomew ___________ court noted, the wrongful act theory, which we think is the most literal reading of "injury-causing event," "has been rejected by the vast majority of jurisdictions." Bartholomew, 502 F. Supp. ___________ at 253 (citing Annotation, 57 A.L.R.2d 1358 (1958)).12 For the reasons stated above, we think that the law of Rhode Island is "unclear" with respect to the trigger-of-coverage issue. See Lehman Brothers v. Schein, 416 U.S. 386, 94 S. Ct. ___ _______________ ______ 1741, 40 L.Ed.2d 215 (1974). We also think that the trigger-of- coverage issue is determinative of this appeal. We therefore conclude that the most appropriate way to resolve the trigger of coverage issue, consistent both with our duty to apply Rhode Island law and with important principles of federalism, is to certify the question to the Rhode Island Supreme Court pursuant to Rule 6 of the Rhode Island Supreme Court Rules of Appellate  ____________________ 11 Judgment as a matter of law for Northbrook would be justified under all three of these theories because, based on the evidence adduced by CPC at trial, the pertinent events under these theories of coverage did not take place during the policy period. The significance of the fact that the statement could be interpreted as adopting any of three different standards, however, lies not in the substance of the three potential standards, per se, but in the way it reflects the indeterminate ___ __ nature of the statement itself. 12 Rhode Island is, of course, entitled to adopt a minority rule and, provided it does not contravene federal law, which this clearly would not, we would be bound to apply it in this case. However, given the other considerations listed above, we think it is appropriate to take this factor into account. -28- Procedure. For the foregoing reasons, the district court's choice- of-law decision is affirmed and a question certified to the Rhode ______________________________________________ Island Supreme Court, with jurisdiction retained pending that _________________________________________________________________ determination. _____________ -29- UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ________________ No. 94-1276 CPC INTERNATIONAL, INC., Plaintiff - Appellant, v. NORTHBROOK EXCESS & SURPLUS INSURANCE COMPANY, Defendant - Appellee. _______________ CERTIFICATION _______________ This Court hereby certifies a question of Rhode Island state law to the Rhode Island Supreme Court, pursuant to Rule 6 of the Rhode Island Supreme Court Rules of Appellate Procedure, and provides a brief statement of the grounds for certification. The insurance policy at issue in CPC Int'l Inc. v. ________________ Northbrook Excess & Surplus Ins. Co., No. 94-1276, requires that ____________________________________ the "occurrence" causing "property damage" must take place during the policy period in order for coverage to be provided. In the body of its Opinion in that case, this Court has identified seven different approaches used by courts in different jurisdictions for determining when an injury takes place in order to trigger coverage. The different approaches are: the wrongful act theory, the exposure theory, the injury-in-fact theory, the manifestation theory, the first discovery theory, the "reasonably knew or should have known" theory, and the continuous trigger theory. -30- Neither of the two potentially relevant cases the Court identified from Rhode Island -- Textron, Inc. v. Liberty Mutual ______________ ______________ Insurance Co., 639 A.2d 1358 (R.I. 1994) and Bartholomew v. ______________ ___________ Appalachian Insurance Co., 502 F. Supp. 246 (D.R.I.), aff'd, 655 _________________________ _____ F.2d 27 (1981) -- provides the necessary means to predict which trigger-of-coverage standard the Rhode Island Supreme Court would apply. Accordingly, the Court certifies the following question to the Rhode Island Supreme Court: What trigger-of-coverage standard would the Rhode Island Supreme Court use for determining at what point an "occurrence" causing "property damage" took place, within the meaning of the insurance policy provisions provided in the separate opinion in this case, where an insured alleges that a spill of hazardous contaminants in 1974 migrated through the groundwater, causing immediate injury to the pertinent property, which was not, in fact, discovered, however, until at least 1979? The relevant facts are discussed in the separate opinion in this case. In putting the above question to the Rhode Island Supreme Court, we wish to make clear that we would, of course, welcome the advice of the Court on any other question of Rhode Island law it deems material to this case and upon which it wishes to comment. -31- The Clerk of this court will transmit this question and our separate opinion in this case, along with copies of the briefs and appendix in this case, to the Rhode Island Supreme Court. United States Court of Appeals for the First Circuit By: _______________________ Juan R. Torruella Chief Judge Dated: January 19, 1995 -32-