**TEXTRON, INC.**

v.

**LIBERTY MUTUAL INSURANCE CO.**

No. 93–218–A.

Supreme Court of Rhode Island.

April 8, 1994.

John Bomster, Victoria Almeida, John Tarantino, Adler, Pollock & Sheehan, Providence, Eugene Anderson, New York City, for plaintiff.

John P. McGann, Liberty Mut. Ins. Co., Harry Asquith, Jr., Asquith, Merolla, Anderson, Archetto & Kane, Providence, William F. Cupelo, Liberty Mut. Ins. Co., Pamela Meister, Boston, MA, for defendant.

## OPINION

WEISBERGER, Acting Chief Justice.

This case comes before us on appeal by the plaintiff, Textron, Inc. (Textron), from a summary judgment entered in the Superior Court in favor of the defendant, Liberty Mutual Insurance Company (Liberty). For the reasons stated herein, we affirm the entry of summary judgment.

The issue presented to us on appeal is whether various insurance policies issued by Liberty provided Textron coverage for claims arising from either property damage or personal injuries that took place during the policy periods but which were not reported to Liberty until twenty-one years after the expiration of the last policy. The undisputed facts surrounding this appeal are as follows.

### I

Between 1961 and 1966, Textron purchased from Liberty five successive comprehensive general-liability insurance policies, each with identical terms. Each policy consisted of a five-page standard printed form

policy (the standard policy) and a series of endorsements that spanned thirty-four pages. The relevant portions of the standard policy are as follows:

### "INSURING AGREEMENTS

"I Coverage A—BODILY INJURY LIABILITY To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person and caused by accident.

"Coverage B—PROPERTY DAMAGE LIABILITY To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident.

\* \* \* \* \* \*

"IV POLICY PERIOD, TERRITORY This policy applies only to accidents which occur during the policy period within the United States of America, its territories or possessions, or Canada.

\* \* \* \* \* \*

### CONDITIONS

\* \* \* \* \* \*

"8 NOTICE OF ACCIDENT When an accident occurs written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable."

The relevant portions of the endorsements are:

"*AMENDATORY ENDORSEMENT* [Endorsement Serial No. 1]

\* \* \* \* \* \*

"4. Coverage A—Substitution of 'Occurrence' for 'Accident'—with respect to Coverage A—Personal Injury Liability only, the word 'occurrence' as defined herein is substituted for the word 'accident' wherever the latter appears in the policy.

"The word 'occurrence' means an unexpected happening or event or a continuous

or repeated exposure to conditions which results in injury during the policy period provided the insured did not know or intend that injury would result.

"5. Coverage B—Property Damage Liability on an 'Occurrence Basis'—With respect to such insurance as is afforded by the policy for physical injury to or destruction of tangible property, real or personal, and the resulting loss of use thereof, the word 'accident' wherever used in the policy shall be deemed to include any occurrence as defined herein.

" 'Occurrence' means an event, or continuous or repeated exposure to conditions, which unexpectedly and unintentionally causes physical injury to or destruction of tangible property.

* * * * * *

"7. *World Wide Coverage, Policy Period Modified*—Insuring Agreement [Part] IV is amended to read:

'The policy applies only to (1) personal injury, sickness or disease, including death resulting therefrom, and (2) injury to or destruction of property, including loss of use thereof, which occur during the policy period anywhere in the world; however, if the insured, at the time a claim is made against it, is no longer covered by a liability policy issued by the company, this policy shall not apply under Coverage B to injury to or destruction of property, including the loss of use thereof, which is caused by exposure to conditions over a period of days, weeks, months, or longer and which is not reported by the insured to the company within one year after the policy period.' "

The last policy issued to Textron by Liberty expired on January 1, 1966. Thereafter Textron changed insurance carriers.

In the mid to late 1980's the Environmental Protection Agency, numerous state environmental agencies, and various private parties brought actions against Textron in connection with its alleged environmental contamination of a myriad of sites across the United States. Textron first reported the environmental-based claims to Liberty in August 1987, which was twenty-one years after the expiration of the last Liberty policy. Liberty refused to defend against or provide indemnification for the claims because, it asserted, the injury to or destruction of the property had not been reported to Liberty within one year after its last policy had expired as required by clause number seven of the Amendatory Endorsement, Endorsement Serial No. 1 (clause seven).

Textron had filed a declaratory-judgment action in Superior Court, seeking, inter alia, a determination that the Liberty policies provided coverage for all alleged environmental contamination that may have occurred between 1961 and 1966. Liberty moved for summary judgment pursuant to Rule 56 of the Superior Court Rules of Civil Procedure. Upon reviewing the policies and determining the language to be "relatively clear," the trial justice ruled that the one-year reporting requirement in clause seven barred all Textron's claims. The trial justice also determined that although the policies appeared to be "hybrids," containing elements of both occurrence[1] and claims-made[2] policies, the

---

1. In the area of general-liability insurance, an occurrence policy provides coverage for any "occurrence" which takes place during the policy period. Under this type of policy it is irrelevant whether the resulting claim is brought against the insured during or after the policy period, as long as the injury-causing event happens during the policy period. *See DiLuglio v. New England Insurance Co.*, 959 F.2d 355, 358 (1st Cir.1992); *see also Gereboff v. The Home Indemnity Co.*, 119 R.I. 814, 818 n. 1, 383 A.2d 1024, 1026 n. 1 (1978). The distinguishing feature of an occurrence policy is that it results in so-called "tail" coverage, which refers to the lapse of time between the occurrence and the date a claim is

made. *Gulf Insurance Co. v. Dolan, Fertig and Curtis*, 433 So.2d 512, 515 (Fla.1983).

2. A claims-made policy provides coverage for any claim first asserted against the insured during the policy period, regardless of when the incident giving rise to the claim occurred. Absent a provision requiring notice within a set period after policy expiration, standard claims-made policies "implicitly allow * * * reporting of the claim to the insurer after the policy period, as long as it is within a reasonable time." 2 Rowland Long, *The Law of Liability Insurance*, § 12A.05[3A] at 40 (Supp.1991). Claims-made policies extinguish the never-ending-tail liability,

policies did not violate public policy. Accordingly the trial justice entered summary judgment in favor of Liberty.

## II

Textron's claims are based upon both property damage and personal injuries. As discussed herein, Liberty's policies set forth separate and distinct requirements for these two types of claims. We therefore consider the coverage issues for property-damage claims separately from those relating to the personal-injury claims.

### A. Property–Damage Claims

The central issue before us is whether, under the terms of Liberty's policies, coverage existed for property damage which allegedly occurred during the policy periods but which was not reported to Liberty until twenty-one years after the policies's expiration.

Textron proffers several theories in support of its position that coverage existed under the policies. The thrust of Textron's first theory is that the policies contained two separate notice provisions, condition number eight in the Insuring Agreements and clause seven in the Amendatory Endorsement. Textron claims that these provisions apply to domestic and international claims, respectively. Since its present claims are domestic in nature, Textron asserts that clause seven has no application and cannot bar coverage. In the alternative Textron argues that even if clause seven does apply to domestic claims, the time limit therein cannot be enforced for two reasons. First, Textron contends that the notice-prejudice doctrine precludes enforcement absent a showing of prejudice by Liberty. Second, Textron asserts that the

provision restricts Textron's freedom to contract and thereby violates public policy.

█ In reviewing an entry of summary judgment, we apply the same standard as the trial justice below. *Barratt v. Burlingham,* 492 A.2d 1219, 1220 (R.I.1985). Under that well-established standard, the trial justice must review the pleadings, affidavits, and other appropriate evidence in the light most favorable to the party opposing the motion. *Hodge v. Osteopathic General Hospital of Rhode Island,* 107 R.I. 135, 141–42, 265 A.2d 733, 737 (1970). If, when the evidence is viewed in such light, no material issues of fact exist and the movant is entitled to judgment as a matter of law, the trial justice must enter summary judgment. *Alfano v. Landers,* 585 A.2d 651, 652 (R.I.1991).

█ As we have stated in prior cases, whether coverage exists in any given case for a particular damage-causing event depends first and foremost upon the precise terms and conditions of the policy in question. *See Mullins v. Federal Dairy Co.,* 568 A.2d 759, 762 (R.I.1990). When presented with a pre-printed-form policy with various endorsements attached thereto, we read the two components together, with the terms of the preprinted form remaining intact except to the extent they are altered by the endorsements. 13A John Appleman and Jean Appleman, *Insurance Law and Practice,* § 7537 at 143–44 (1976). In so doing, we give the language in both the form policy and the endorsements its plain, ordinary, and usual meaning. *Malo v. Aetna Casualty and Surety Co.,* 459 A.2d 954, 956 (R.I.1983); *Bush v. Nationwide Mutual Insurance Co.,* 448 A.2d 782, 784 (R.I.1982). If the terms are clear and unambiguous, we must enforce the policy

---

which is characteristic of occurrence policies. *See DiLuglio,* 959 F.2d at 358.

There are also several variations of the claims-made policy, such as the claims-made-and-reported policy. *See, e.g., Burns v. International Insurance Co.,* 929 F.2d 1422 (9th Cir.1991) (claims to be reported within sixty days of termination of policy); *Esmailzadeh v. Johnson and Speakman,* 869 F.2d 422 (8th Cir.1989) (claims to be made and reported during policy period); *Zuckerman v. National Union Fire Insurance Co.,* 100 N.J. 304, 495 A.2d 395 (1985) (claims to be made and reported during policy period). As

one commentator has explained, a claims-made-and-reported policy "covers only claims first made during the policy period but also imposes the condition that, to be entitled to coverage, the insured must also report the claim to the insurer within the policy period, or within a specified time after learning of the claim (often prescribed to be 30, 60 or 90 days)." Long, § 12A.05[3A] at 40. Many courts fail to distinguish between claims-made and claims-made-and-reported policies, and simply speak in broad terms of "claims-made" policies.

as written and refrain from engaging in any judicial modification of the policy terms. *Amica Mutual Insurance Co. v. Streicker,* 583 A.2d 550, 551 (R.I.1990); *Malo,* 459 A.2d at 956.

■ In the case at hand the terms of coverage for property damage are set forth in Part I, Coverage B of the Insuring Agreements, as amended by clauses five and seven of the Amendatory Endorsement. When we read these provisions together, we perceive no ambiguity and find the terms and scope of coverage readily apparent. Given their plain and ordinary meaning, these provisions clearly impose two requirements before coverage attaches: (1) the property damage must occur during the policy period, and (2) if Textron is no longer insured by Liberty, such damage must be reported within one year of the expiration of the policy.

■ In this case both requirements were clearly not met. Even if the property damage occurred during the policy periods, such damage was not reported to Liberty until some twenty-one years later, a period well beyond the one-year time limitation prescribed by clause seven. Given this fact, we are led to the inescapable conclusion that coverage for the property damage in question never attached. To hold otherwise would be tantamount to rewriting the policies and eliminating the second requirement relating to the reporting period. This we shall not do. Accordingly, we hold that noncompliance with the reporting requirement precludes recovery by Textron for property damage under all five policies.

1. Textron's Domestic/International Distinction

In so holding, we reject Textron's argument that clause seven applies only to international claims. Under Textron's theory, coverage for international claims is derived from the provisions of the Amendatory Endorsement while coverage for domestic claims[3] is derived solely from the Insuring Agreements. Textron asserts that given this dichotomy, it logically follows that the one-year notice provision that appears in clause seven applies only to international claims and the notice provision requiring notice "as soon as practicable," which appears in the Insuring Agreements, applies only to domestic claims.[4]

We are of the opinion that there is simply no basis for Textron's assertion that domestic coverage and international coverage are derived from different portions of the policies. We think it clear that coverage for all property damage, whether its locus is domestic or international, is derived from Part I of the Insuring Agreements, as amended by clauses five and seven. Thus there is a definite interplay between the Insuring Agreements and the Amendatory Endorsement, which Textron either fails to recognize or refuses to acknowledge.[5]

3. In light of the language in Part IV of the Insuring Agreements, Textron uses the term "domestic claims" to mean claims brought within the United States of America, including its territories and possessions, and Canada. The term "international claims" encompasses all claims not falling within the definition of domestic claims.

4. Textron also claims that "by agreeing to defend Textron as to [Textron/Ex–Cell–O, another unrelated] site under the very same liability insurance policies, Liberty Mutual conceded that the one-year notice requirement has no application to claims brought within the United States." The "agreement to defend" to which Textron refers appears in a letter from Liberty dated April 11, 1991, wherein Liberty stated that "[w]e will agree to take part in the defense of this claim, from the date it was reported to Liberty Mutual, with all applicable carriers, under a full reservation of rights, of all our policy terms and should

we determine that we have no coverage for this claim we can withdraw from the defense upon providing written notice to Textron/ Ex–Cell–O." Given Liberty's reservation of rights and the fact that the Textron/Ex–Cell–O site is in no way connected to the present sites, we fail to see the validity of any concession or waiver on Liberty's part in regard to the present sites.

5. Furthermore, Textron's reliance upon the phrase "anywhere in the world" to establish its domestic/international distinction is also misplaced. In essence Textron equates "anywhere in the world" with "foreign countries." However, we find that in various other clauses appearing in the Amendatory Endorsement the parties actually utilized the phrase "foreign countries" when they intended to denote a domestic/international distinction. In addition, Textron's argument that the United States does not fall within the class of countries described in the phrase

In addition, Textron errs in its characterization under this theory of clause seven as a notice provision. In order to expose the error in this characterization, we must explore the differences between notice provisions and reporting requirements. Whereas both types of provisions require a literal "notification" of the insurer, the notification serves materially different purposes in the two provisions. In the case of a notice provision, which is typically found in occurrence and claims-made policies and usually requires notice "as soon as practicable," the notification serves to facilitate the timely investigation of claims by bringing an event to the attention of the insurer and allows an inquiry "before the scent of factual investigation grows cold." *Dalzell v. Northwestern Mutual Insurance Co.,* 218 Cal.App.2d 96, 103, 32 Cal.Rptr. 125, 129 (1963); *see also Siravo v. Great American Insurance Co.,* 122 R.I. 538, 542, 410 A.2d 116, 118 (1980) (notice affords an "opportunity for investigation to protect [the insurer's] interests"); *Johnson Controls, Inc. v. Bowes,* 381 Mass. 278, 282, 409 N.E.2d 185, 187 (1980); 2 Rowland Long, *The Law of Liability Insurance,* § 13.02 at 13–8 (1992). In contrast, in the case of a reporting requirement, which is typically found only in a claims-made-and-reported policy, the prescribed notification actually defines the scope of coverage provided by the policy, as the "transmittal of notice of the claim to the insurance carrier" is the event that triggers coverage. *Zuckerman v. National Union Fire Insurance Co.,* 100 N.J. 304, 324, 495 A.2d 395, 406 (1985); *see also Gulf Insurance Co. v. Dolan, Fertig and Curtis,* 433 So.2d 512, 515 (Fla.1983) (coverage depends upon reporting a claim during the policy period).

When we view it against this background, we think it quite clear that the notification requirement in clause seven operates to define the scope of coverage and may be appropriately characterized as part and parcel of the coverage granted by Liberty. Accordingly we reiterate our previous determination that the latter portion of clause seven is in fact a reporting requirement, such as that found in a claims-made-and-reported policy.

In so holding, we recognize the peculiar nature of Liberty's policies, which provide coverage for property damage on an "occurrence" basis yet include a reporting requirement traditionally only found in claims-made-and-reported policies. Although such dual characteristics preclude categorically labeling the policies as either "occurrence" or "claims-made-and-reported" policies, that fact in no way undercuts our analysis. When dealing with hybrid creatures, such as Liberty's policies, we emphasize that our inquiry into the nature of any provision must necessarily be guided by the operation and substance of a particular provision rather than any label that may coincidentally or haphazardly be attached to a policy.

For the above reasons we reject Textron's assertion that clause seven operates as a notice provision that only applies to non-domestic claims.

### 2. Textron's Notice–Prejudice Theory

We next turn to Textron's assertion that the reporting requirement cannot be enforced without a showing of prejudice. This argument rests upon the so-called notice-prejudice doctrine set forth in *Pickering v. American Employers Insurance Co.,* 109 R.I. 143, 282 A.2d 584 (1971), and its progeny.

In *Pickering* we considered the meaning of a provision in an occurrence policy that required that notice be given to the insurer "as soon as practicable." *Id.* at 158, 282 A.2d at 592. Interpreting this provision to require notice within a reasonable time, we reasoned that prejudice to the insurer determined to a great extent whether the timing of notice in a particular case was reasonable. We based our rationale in large part upon the recognition that most insurance policies in this day and age are contracts of adhesion, offered to consumers on a take-it-or-leave-it-basis.[6]

---

"anywhere in the world" defies the plain and ordinary meaning of the words.

**6.** We recognized in *Pickering v. American Employers Insurance Co.,* 109 R.I. 143, 159–60, 282 A.2d 584, 593 (1971), that many insurance policies are "not the end result of the give-and-take

Given this fact, we reasoned that the technical breach of a notice provision, when the consumer is afforded no realistic opportunity to negotiate the deletion of this provision from the policy, should not bar recovery for benefits for which the consumer has already paid. *Id.* at 160, 282 A.2d at 593.

In various subsequent decisions we have affirmed the notice-prejudice rule in the context of occurrence policies. *See Pennsylvania General Insurance Co. v. Becton,* 475 A.2d 1032, 1035 (R.I.1984); *A & W Artesian Well Co. v. Aetna Casualty & Surety Co.,* 463 A.2d 1381, 1382–83 (R.I.1983); *Cooley v. John M. Anderson Co.,* 443 A.2d 435, 437 (R.I.1982); *Siravo,* 122 R.I. at 547, 410 A.2d at 121. We have not, however, had occasion to consider directly whether the rule applies with equal force to claims-made policies. *See DiLuglio v. New England Insurance Co.,* 959 F.2d 355, 358–59 (1st Cir.1992); *see also Gereboff v. The Home Indemnity Co.,* 119 R.I. 814, 383 A.2d 1024 (1978) (terms of claims-made policies enforced without considering possible application of the notice-prejudice rule).

▉ In order to rely on *Pickering,* Textron claims, as it must, that Liberty's policies are "occurrence" policies. However, as discussed above, with respect to property damage Liberty's policies were not generic occurrence policies but rather hybrid occurrence policies containing reporting requirements. Given this fact, we refuse to apply *Pickering*'s notice-prejudice rule mechanically. Rather we must explore whether the incorporation of the reporting requirement presents any distinctions or countervailing considerations that militate against applying *Pickering*'s rule.

▉ First, we consider that the reporting requirement operates substantively to define the scope of coverage, as opposed merely to facilitate the insurer's investigation of a claim. The very nature of the coverage provided required reporting within a specific timeframe. Given this fact, excusing Textron's delay would alter a fundamental term of the policy in respect to property damage. *Cf. Esmailzadeh v. Johnson and Speakman,* 869 F.2d 422, 424 (8th Cir.1989) (under a claims-made-and-reported policy excusing delay beyond policy period "would alter a basic term of the insurance contract"); *City of Harrisburg v. International Surplus Lines Insurance Co.,* 596 F.Supp. 954, 961 (M.D.Pa.1984), aff'd, 770 F.2d 1067 (3d Cir. 1985) (giving an extension of reporting time after policy expiration rewrites the contract between the parties); *Gulf Insurance Co.,* 433 So.2d at 515–16 (extending reporting time "in effect rewrites the contract between the two parties").

It is also important to consider the relationship between the scope of coverage provided and the amount of the premium charged. Liberty's policies, as amended by clause five of the Amendatory Endorsement, provided coverage on an occurrence basis. Had the parties put their pens down after drafting clause five and not added clause seven, Textron would have enjoyed unlimited "tail" coverage (*see* n. 1 *supra*). However, by including clause seven's reporting requirement, Textron's tail coverage was strictly circumscribed and eliminated, except for the one-year window of coverage following policy expiration. Since the amount of an insured's premium is predicated upon the scope of coverage and the risk assumed, we can logically infer that Textron paid a premium that was proportional to the risk.[7] In light of this

---

that goes on at a bargaining table. * * * [And are] not a true consensual arrangement but one that is available to the premium-paying customer on a take-it-or-leave-it-basis." *See also Siravo v. Great American Insurance Co.,* 122 R.I. 538, 541, 410 A.2d 116, 117–18 (1980); *Donahue v. Hartford Fire Insurance Co.,* 110 R.I. 603, 604, 295 A.2d 693, 694 (1972).

**7.** Other courts have drawn similar inferences. *See Burns,* 929 F.2d at 1425 ("[a] claims-made policy reduces the potential exposure of the insurer and is therefore less expensive to the insured");

sured"); *City of Harrisburg v. International Surplus Lines Insurance Co.,* 596 F.Supp. 954, 961 (M.D.Pa.1984), aff'd, 770 F.2d 1067 (3d Cir. 1985) (because an insurer's liability under a claims-made policy "does not extend beyond the end of a specific term * * * an insured pays a lesser premium"); *Gulf Insurance Co.,* 433 So.2d at 516 (lower premiums are charged because "there is no open-ended 'tail' after the expiration date of the policy"); *see also Esmailzadeh,* 869 F.2d at 425 (when certain risks are disclaimed, the amount of the premium charged is presumably lower).

fact, application of the notice-prejudice rule and excusal of noncompliance with the reporting requirement would result in a dramatically enhanced expansion of coverage for Textron and an increased risk of exposure for Liberty that was not contemplated in the original bargain. *See Gulf Insurance Co.,* 433 So.2d at 515 ("extension of reporting time * * * is tantamount to an extension of coverage to the insured gratis, something for which the insurer has not bargained"); *Zuckerman,* 100 N.J. at 324, 495 A.2d at 406 (extending reporting period expands coverage by exposing insurer "to a risk substantially broader than that expressly insured against in the policy").

▮ Next we consider the adhesion-contract rationale at the heart of our decision in *Pickering.* In the case at hand we have no doubt that these policies were not Liberty's standard packaged product offered to Textron on a take-it-or-leave-it basis. We need only look to the thirty-four pages of endorsements that extensively amended the standard policy to confirm this fact. Nor was Textron an average consumer with little bargaining power. On the contrary, Textron was a sophisticated multi-million-dollar corporation engaged in domestic and international ventures, a customer that apparently wielded extensive leverage in the negotiation process with Liberty. These facts lead us to conclude that the reporting requirement about which Textron now complains was the product of arm's-length negotiations between Textron and Liberty. As such, the "true consensual arrangement" absent in *Pickering* is present in this case and undercuts the adhesion-contract rationale underlying the notice-prejudice rule.[8]

▮ On a final note, the fact that Liberty's policies do not provide coverage in the face of an avalanche of environmental claims "do[es] not alone constitute ground for refusal to enforce an agreement intelligently and freely made by competent parties standing on an equal footing." *Kaplan v. Suher,* 254 Mass. 180, 185, 150 N.E. 9, 11 (1926).

In conclusion, we hold that the above considerations militate against extending the notice-prejudice rule to the reporting requirement in Liberty's policies.

### 3. Textron's Public Policy Argument

Finally, Textron, citing *Jones v. Continental Casualty Co.,* 123 N.J.Super. 353, 303 A.2d 91 (1973), claims that the reporting requirement converts Liberty's occurrence-based policies into impermissible hybrid policies in violation of public policy.

▮ In light of our discussion of the *Jones* decision in *Gereboff v. The Home Indemnity Co., supra,* which involved policies somewhat similar to Liberty's, we find little merit in Textron's argument. We reiterate the sentiments we expressed in *Gereboff* that "we are unaware of any principle that * * * prevents an insurer from imposing reasonable conditions upon the obligations it assumes in its contract." 119 R.I. at 822, 383 A.2d at 1028. The reporting requirement is such a reasonable restriction, operating to limit Liberty's exposure for certain property-damage claims. Furthermore, we have previously held that "in the absence of a statutorily declared policy to the contra, the parties to an insurance agreement are free to contract as they desire." *Constant v. Amica Mutual Insurance Co.,* 497 A.2d 343, 345 (R.I.1985); *see also Faraj v. Allstate Insurance Co.,* 486 A.2d 582, 586 (R.I.1984). No statutes have been brought to our attention that prohibit the issuance of policies such as Liberty's.

We also stated in *Gereboff* that no principle had been brought to our attention that "condemns on public policy grounds coverage that combines elements of both 'discovery' [claims-made] and 'occurrence' policies, but

---

**8.** We acknowledge that in *Donahue v. Hartford Fire Insurance Co.,* 110 R.I. 603, 295 A.2d 693 (1972), we recognized an additional basis for the *Pickering* rule. Therein we stated:

"[T]here is an implicit realization on our part that in this day and age attempts to comply with notice provisions are sometimes carried on in a very informal way which frequently consists of no more than a telephone call by an insured to the seller of the policy who then, because of his desire to serve his customer, takes over from there." 110 R.I. at 604–05, 295 A.2d at 694.

This rationale, however, has no application given the facts in the instant case.

provides less protection than is customarily afforded by either." 119 R.I. at 822, 383 A.2d at 1028.

 Finally, the reporting requirement in Liberty's policies does not operate either to tie Textron to Liberty after the expiration of its policies or "unduly [to] restrict [Textron's] ability to obtain adequate protection elsewhere," *id.* at 820, 383 A.2d at 1027, which, in fact, it did after 1965.

In conclusion, given our discussion of the scope of coverage for property-damage claims, we conclude that even when viewed in the light most favorable to Textron, the pleadings and supporting documentation allege no set of facts that would give rise to coverage for property damage under any of the Liberty policies, more than twenty-one years after the expiration thereof.

For the reasons set forth above, we affirm the entry of summary judgment in regard to Textron's property-damage claims.

### B. Personal–Injury Claims

Turning to Textron's personal-injury claims, the terms of coverage for such claims are set forth in Part I, Coverage A, as amended by clauses four and seven of the Amendatory Endorsement. Read together, these provisions provide coverage for personal injury, sickness, disease or death sustained by any *person* as a result of any "occurrence" which takes place anywhere in the world during the policy period. We read these provisions collectively to provide traditional occurrence-based coverage for personal-injury claims. We note that the reporting requirement in the latter half of clause seven applies only to "Coverage B [relating] to injury to or destruction of property" and therefore has no application to Textron's personal-injury claims.

 We do, however, affirm the entry of summary judgment in respect to Textron's personal-injury claims because Textron has alleged no set of facts under which such coverage could exist. Upon reviewing the complaints brought against Textron, we find that none of the counts alleges or even suggests that any human being has sustained injury to his or her person as a result of

Textron's alleged environmental contamination of various parcels of land. Under the express language of the policy, coverage for personal injuries was restricted to "bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any *person.*" (Emphasis added.) Part I, Coverage A of the Insuring Agreements.

Textron suggests that other jurisdictions "have held that a 'personal injury' provision in a liability insurance policy may provide coverage for environmental liabilities." We decline to address this issue in light of the express language of the policy requiring a physical injury to a human being.

For the foregoing reasons Textron's appeal is denied and dismissed. We affirm the entry of summary judgment in favor of Liberty with respect to Textron's claims for defense and indemnification for both property damage and personal injuries.