CHILDREN'S FRIEND & SERVICE

v.

ST. PAUL FIRE & MARINE INSURANCE COMPANY.

No. 2004–35–Appeal.

Supreme Court of Rhode Island.

Feb. 2, 2006.

---

Matthew T. Oliverio, for Plaintiff.

Thomas R. Bender, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

Justice SUTTELL, for the Court.

This appeal arises out of an action for declaratory judgment, brought by Children's Friend & Service (plaintiff or CFS), concerning an insurance policy St. Paul Fire & Marine Insurance Company (defendant or St. Paul) issued to CFS in 1982. The impetus behind the complaint was an underlying tort action against CFS involving claims of wrongful adoption. In the declaratory judgment action, certain issues concerning indemnity coverage were severed and stayed pending resolution of the underlying tort action. The only remaining issue, which concerned the applicability of an endorsement that St. Paul said was part of CFS's policy in 1982, was tried before a jury.[1] After a verdict in CFS's favor and entry of final judgment pursuant to Rule 54(b) of the Superior Court Rules of Civil Procedure, St. Paul filed a re-newed motion for judgment as a matter of law and a motion for a new trial, both of which were denied by the trial justice.

On appeal, St. Paul assigns error to the trial justice's denial of both its renewed motion for judgment as a matter of law and its motion for a new trial. The gravamen of defendant's appeal is its assertion that the trial justice erroneously instructed the jury on the substantive law concerning the construction of insurance contracts. Because we are satisfied that the trial justice correctly applied the substantive law in charging the jury, and because we conclude the record provides a legally sufficient evidentiary basis for the jury to have found for CFS, we affirm the judgment.

## I

### Facts and Procedural History

A brief description of the underlying tort action provides the backdrop for the issues presented in the case before us. On January 12, 1998, Joseph and Linda Rowey, along with their daughters Meghan and Lisa, filed suit against CFS concerning the adoption of Lisa, which had been made final on September 21, 1983.[2] CFS was founded in 1834 and is one of the oldest nonprofit social service agencies in the country. As described by its executive director, its primary mission is "to make sure that disadvantaged young children * * * get off to the best possible start in life." To accomplish this goal, CFS provides a variety of community and home-based services, including adoption services. In their complaint, the Roweys alleged that CFS failed to provide them with

---

1. An endorsement, sometimes referred to as a rider, is a separate document the terms of which augment, supplement, lessen, or exclude certain terms in an insurance policy.

2. On December 12, 2003, various motions were granted in the underlying tort action, the effect of which was to dismiss all of the Roweys' claims save those of Meghan. The matter is currently on appeal in this Court.

Lisa's complete and accurate medical history before adoption, and failed to inform them of her probable need for care.

On February 7, 1997, before filing suit, the Roweys' attorney notified CFS of her representation of the Roweys concerning their dispute with CFS over the wrongful adoption of Lisa. Upon receipt of the letter, CFS's executive director, Lenette Azzi–Lessing, notified legal counsel, who instructed Dr. Azzi–Lessing to identify all insurance companies with whom CFS maintained a liability policy for the applicable period. Doctor Azzi–Lessing, with the assistance of staff, located certain insurance records pertaining to St. Paul, including a one-page document entitled "DECLARATIONS" (declarations page) for the policy period from November 17, 1982 to November 17, 1983, another one-page document entitled "RENEWAL CERTIFICATE" for the period from January 1, 1984 to January 1, 1985, and a multipage document entitled "UMBRELLA EXCESS LIABILITY POLICY" (standard form policy) covering the period from January 1, 1985 to January 1, 1986. The declarations page indicates a policy number of "569XE5976," and identifies St. Paul as the insurer and CFS as the insured, with a liability limit of $1 million. The standard form policy, which does not bear a specific policy number, is a pre-printed document that provides the details of coverage under St. Paul's basic excess liability policy. An introductory page to the 1985 standard form policy references a "Professional Services Exclusion Endorsement" as one of the forms included in the policy.

Doctor Azzi–Lessing notified St. Paul of the potential claim against CFS for wrongful adoption in a letter dated March 18, 1997, but received no reply from St. Paul. After the complaint was filed, Dr. Azzi–Lessing sent a second letter, on January 29, 1998, this time to an attorney representing St. Paul. The attorney responded on February 24, 1998, indicating that St. Paul would evaluate the extent to which the policy provided coverage, if at all, should CFS incur liability. After a series of correspondence, St. Paul informed CFS by letter dated April 6, 1998, that the policy did not provide coverage for the liability invoked in the Roweys' complaint. St. Paul based its decision on an endorsement that excluded coverage for "Personal Injury or Property Damage arising out of professional services rendered or which should have been rendered for others in the Insured[']s capacity as an Adoption & Social Welfare Agency."

Thereafter, on July 24, 1998, CFS initiated the present action, seeking declaratory judgment that the 1982–1983 policy covered CFS should the Roweys succeed on their claims in tort. On June 17, 2002, the parties filed a joint motion, which sought to sever certain issues before trial. The parties agreed that the resolution of those issues, which included the question of indemnity coverage, would be premature before the complete litigation of the underlying tort action against CFS. Specifically, the parties maintained that defenses concerning whether there was an "occurrence" or "personal injury" during the policy period of November 17, 1982 to November 17, 1983, depended in large part upon factual determinations in the underlying, and yet undecided, wrongful adoption tort action against CFS. The parties acknowledged, however, that the issue concerning the applicability of the professional services endorsement was properly before the court and perhaps even dispositive concerning CFS's remaining claims; should CFS fail to succeed on this issue, a subsequent determination of indemnity would be irrelevant because no coverage would exist from which CFS could seek indemnification. The motion justice

agreed, and issued an order on July 25, 2002, effectively bifurcating CFS's claims.

The trial was heard on various days throughout January 2003. After instructing the jury, the trial justice presented two interrogatories to the jury. The first, which was CFS's burden to prove by a preponderance of the evidence, said: "Do you find that St. Paul Fire & Marine Insurance Company * * * issued an Excess Umbrella Liability Policy naming Children's Friend and Service as the Named Insured, effective from November 17, 1982 to November 17, 1983 * * *?" The second, for which St. Paul bore the same burden of proof, said: "Do you find that an endorsement entitled 'Exclusion of Professional Liability or Error and Omissions' was part of and attached to the Umbrella Excess Liability Policy when issued?" After deliberating, the jury answered the first interrogatory in the affirmative, and the second in the negative. Referring to the court's July 25, 2002 order severing CFS's claims, the trial justice entered judgment under Rule 54(b) on January 21, 2003.[3] On January 30, 2003, St. Paul moved for renewed judgment as a matter of law and a new trial, pursuant to Rules 50(b) and 59(a) of the Superior Court Rules of Civil Procedure, respectively. The trial justice entertained the post-verdict motions at a March 31, 2003 hearing and denied both motions. Orders denying the motions were entered on April 2, 2003, and defendant filed a notice of appeal on April 15, 2003.[4]

## II

## Discussion

### A. Renewed Judgment as a Matter of Law

We begin by addressing the trial justice's denial of defendant's renewed motion for judgment as a matter of law pursuant to Rule 50(b). The defendant advances two arguments. The first is predicated upon an alleged error in the instructions through which the trial justice charged the jury. St. Paul argues that instructing the jury to find whether the "professional services endorsement was *attached* to the original policy when it was issued" misinterpreted the applicable substantive law. (Emphasis added.) Second, defendant asserts that we should reverse the denial of the motion because no reasonable jury could have found that the endorsement was not issued with the standard form policy.

When considering a motion for judgment as a matter of law, the trial justice must examine "the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, * * * draw[ing] from the record all reasonable inferences that support the position of the nonmoving party." *Marketing Design Source, Inc. v. Pranda North America, Inc.,* 799 A.2d 267, 271 (R.I.2002) (quoting *Martinelli v. Hopkins,* 787 A.2d 1158, 1165 (R.I.2001)). "If, after such a review, there remain factual issues upon which reasonable persons might draw different

---

**3.** Final judgment originally was entered on a "Civil Judgment on Verdict" (form) on January 14, 2003. The defendant objected to the form, which did not reflect the severed trial and the pendency of other issues. Consequently, the trial justice issued an order on January 21, 2003, vacating the judgment entered on January 14, 2003, and ordering judgment to be entered pursuant to Rule 54(b) of the Superior Court Rules of Civil Procedure.

**4.** The record contains a notice of appeal dated April 15, 2003, and filed *nunc pro tunc* on January 5, 2004. Both the docket sheet and a receipt for the filing fee indicate, however, that the notice originally was filed on April 15, 2003.

conclusions, the motion for [judgment as a matter of law] must be denied * * *." *Wellborn v. Spurwink/Rhode Island,* 873 A.2d 884, 887 (R.I.2005) (quoting *Francis v. American Bankers Life Assurance Co. of Florida,* 861 A.2d 1040, 1045 (R.I.2004)). This Court is bound by the same standards and rules as the trial justice. *Saber v. Dan Angelone Chevrolet, Inc.,* 811 A.2d 644, 648 (R.I.2002).

For reasons more fully discussed in Part II B. of our opinion, we are satisfied that the trial justice did not instruct the jury erroneously about the applicable legal principles. We proceed to address, therefore, defendant's assertions with respect to the sufficiency of the evidence.

■ The defendant argues that CFS had the burden of proving the existence of the umbrella policy, and that its exposure fell within the policy terms. Because CFS was unable to locate a copy of the standard form policy for the relevant period in its records, it necessarily relied upon the testimony of Margaret Johnson,[5] a St. Paul underwriter since 1978, to introduce into evidence the standard form policy in effect in September 1983. The defendant further asserts that Ms. Johnson's undisputed testimony also established that an endorsement, the language of which purports to exclude professional services liability, was issued at the same time. Thus, defendant contends, no reasonable jury could conclude that the standard form policy was issued, but that the endorsement was not.

Ms. Johnson testified that St. Paul's underwriting files pertaining to CFS contained a declarations page indicating a policy period from November 17, 1982 to November 17, 1983. St. Paul's files also contained a one-page document entitled "SCHEDULE A" (schedule of underlying insurance) listing the primary insurance carriers and the respective limits of liability. The specific underwriting file did not contain the preprinted standard form policy, but Ms. Johnson did identify the standard form that would have been in effect during that policy period. Ms. Johnson further testified that the CFS underwriting file also contained a one-page endorsement entitled "EXCLUSION OF PROFESSIONAL LIABILITY OR ERRORS AND OMISSIONS" (professional services endorsement) that she said "was attached to my policy when it was issued."[6]

The endorsement bore no date; nor was it stapled or otherwise physically attached to any other document in the St. Paul underwriting file. Ms. Johnson, however, testified about the routine custom and practice of St. Paul concerning the issuance of policies and endorsements in 1982. She indicated that the policy number, typed in a box in the upper left corner, which says "ATTACHED TO AND FORMING PART OF POLICY NO.," corresponds to the policy number on the declarations page of the 1982–1983 policy. Two other boxes, one for "EFFECTIVE DATE OF ENDORSEMENT" and the other for "ISSUED TO," were left blank. The endorsement document, however, specifically provided that those two boxes "need not be completed if this endorsement and the policy have the same inception date." Because Ms. Johnson's testimony went unchallenged and was not contradicted by any other evidence, defendant maintains that no reasonable jury could conclude that the endorsement was not issued at the same time as the standard form policy.

---

5. Although the stenographer transcribed the witness's name as "Margaret Johnson Mueller," the witness indicated that she preferred "Ms. Johnson."

6. The endorsement at issue is appended to this opinion.

Our independent review of the record, however, leads us to the possibility of a different conclusion. Ms. Johnson also testified that in 1982 it was the practice at St. Paul for a typist to type the necessary information onto the declarations page, the schedule of underlying insurance, and "any endorsements that were attached to that particular policy," and then staple them to the standard form policy. Two sets of complete copies were forwarded to the insurance agent, and St. Paul retained a copy, also stapled together, but without the standard form policy. Ms. Johnson further testified that no typist would "deviate from our custom, standard and practice." John Duval, an insurance agent at Starkweather & Shepley,[7] confirmed that when he received policies from St. Paul in 1982, they were bound together with a staple inside a "jacket." Mr. Duval went on to testify that it was the routine practice of Starkweather & Shepley "to deliver the policies to their insured clients stapled together as they got them from St. Paul." Yet, neither St. Paul nor Starkweather & Shepley produced a copy of the 1982–1983 policy with an endorsement stapled to the declarations page, schedule of underlying insurance, standard form policy, or any other document comprising the insurance contract. St. Paul's and Starkweather & Shepley's failure to locate a document conforming to what Ms. Johnson insisted was the routine custom and practice of St. Paul in 1982, when viewed in a light congenial to CFS, could well lead a jury to infer that the endorsement was not, as stated on the endorsement itself, "ATTACHED TO AND FORMING PART OF POLICY NO. 569XE6952."

In addition, St. Paul was unable to locate a form entitled "RATING/DATA ENTRY WORKSHEET" (rating worksheet), which is a one-page document that indicates the premiums charged for the different types of excess insurance St. Paul provided. If an endorsement added to or subtracted from the coverage that the standard form provided, the rating worksheet would reflect that change in a higher or lower premium. Although not a part of the umbrella policy, it was related to it, and, according to Ms. Johnson, typically would be located in the underwriting file. During trial, plaintiff introduced a rating worksheet for a policy that defendant issued to plaintiff in 1985, a policy that included an undisputed endorsement excluding professional services. The 1985 rating worksheet, while indicating premiums charged for automobile liability and general liability consistent with the policy, left blank the space provided for the premium charged for professional liability coverage. Moreover, the total policy premium charged for all coverage in 1985, noted at the bottom of the rating worksheet, is a sum of only the automobile liability and general liability premiums. Ms. Johnson testified that the absence of a professional liability premium in the 1985 rating worksheet indicates that the policy did not provide professional liability coverage, which was consistent with the exclusionary endorsement.

The production of a rating worksheet applicable to the 1982–1983 policy would have provided strong evidence about whether professional services were covered or excluded in said policy. Conversely, the absence of such a worksheet, which was typically maintained in St. Paul's underwriting file, may have contributed to a reasonable inference that the professional liability exclusion endorsement was not in fact a part of the 1982–1983 policy. This distinction was all the more important be-

---

7. Starkweather & Shepley was CFS's insurance agent for all times relevant to this appeal, and thus dealt directly with St. Paul on CFS's behalf.

cause the declarations page of the 1982–1983 policy made no reference to an endorsement excluding professional services. Indeed, in denying defendant's renewed motion for judgment as a matter of law, the trial justice remarked that the rating worksheet's absence for the 1982–1983 policy called into question St. Paul's entire record-keeping procedure.

We agree with the trial justice that, viewing the evidence in the light most favorable to CFS, the prevailing party, there was sufficient evidence from which the jury could draw reasonable inferences to support its verdict. We hold, therefore, that the trial justice did not err in denying defendant's motion for judgment as a matter of law.

### B.  Motion for a New Trial

█ St. Paul also argues, in the alternative, that even if judgment in its favor as a matter of law was not warranted, it is entitled to a new trial based upon an erroneous jury instruction. The defendant asserts that the trial justice erred in denying its motion for a new trial because she charged the jury under an incorrect legal standard pertaining to the formation of an insurance contract. According to defendant, the trial justice required St. Paul to prove that the endorsement at issue was *physically attached* to the policy when it was issued, a requirement that it posits has "no foundation in law." Instead, defendant contends that "the correct legal standard under which the Court must view the evidence is simply whether the professional services endorsement was *issued with* the standard form policy." (Emphasis added.)

█ General Laws 1956 § 8–2–38 states that, "[i]n every case, civil and criminal, tried in the superior court with a jury, the justice presiding shall instruct the jury in the law relating to the action * * *." It

is well established that "[t]he charge given by the trial justice need only 'adequately cover [ ] the law.'" *Contois v. Town of West Warwick*, 865 A.2d 1019, 1022 (R.I. 2004) (quoting *Plourde v. Myers*, 823 A.2d 1138, 1143 (R.I.2003)). Indeed, "[t]he trial justice is free to use his [or her] own words, after considering the instructions requested by the parties." *Cady v. IMC Mortgage Co.*, 862 A.2d 202, 213 (R.I.2004). In our analysis, we examine the instructions "as a whole in light of the meaning and interpretation that a jury composed of ordinary, intelligent lay persons would give them." *Lieberman v. Bliss–Doris Realty Associates, L.P.*, 819 A.2d 666, 672 (R.I. 2003) (quoting *Hodges v. Brannon*, 707 A.2d 1225, 1228 (R.I.1998)).

█ In a civil case tried before a jury, a trial justice may grant a new trial based on an erroneous jury instruction pursuant to Rule 59(a)(1). *Maglioli v. J.P. Noonan Transportation, Inc.*, 869 A.2d 71, 74 (R.I.2005). As the question before us concerns an alleged error of law, our review is *de novo*. *Votolato v. Merandi*, 747 A.2d 455, 460 (R.I.2000). "[W]e review the record and jury instructions to determine whether the instruction was erroneous." *Maglioli*, 869 A.2d at 75 (quoting *Cruz v. Johnson*, 823 A.2d 1157, 1160 (R.I.2003)).

Our review requires that we first examine the manner in which an insurer in Rhode Island properly incorporates an endorsement into an insurance contract, when the policy itself makes no specific reference to the endorsement in question. We then analyze whether the jury instruction at issue adequately covers the law in our jurisdiction.

█ We begin our analysis with the general principle that this Court construes the terms of an insurance policy "according to the same rules of construction governing contracts." *Gregelevich v. Progres-*

*sive Northwestern Insurance Co.,* 882 A.2d 594, 595 (R.I.2005) (mem.) (quoting *Town of Cumberland v. Rhode Island Interlocal Risk Management Trust, Inc.,* 860 A.2d 1210, 1215 (R.I.2004)). In determining the enforceability of a policy exclusion, we employ a burden-shifting approach: "the insured seeking to establish coverage bears the burden of proving a prima facie case, including * * * the existence * * * of a policy." *General Accident Insurance Company of America v. American National Fireproofing, Inc.,* 716 A.2d 751, 757 (R.I.1998) (citing 19 *Couch on Insurance* § 79:315 (Ronald A. Anderson, 2d ed. 1981)). After the insured meets this burden, "[t]he insurer then bears the burden of proving the applicability of policy exclusions and limitations in order to avoid an adverse judgment." *Id.*

In advising the jury of its responsibility in this regard, the trial justice instructed as follows:

"Now, burden of proof: Generally, the law places the burden of proof on the plaintiff; meaning, that the law imposes upon the plaintiff the obligation or responsibility of proving his or its claim. However, in cases of this type involving an insurance dispute, the law places the burden of proof upon each party to prove different aspects of the case.

"In this matter the insured, Children's Friend & Service, which seeks to establish coverage, bears the first burden of proving a prima facie case; meaning, on its face, of the existence and validity of an insurance policy. Once the insured makes a prima facie showing of coverage, the insurer, St. Paul, then bears the burden of proving the applicability of policy exclusions and limitations.

"Thus, the law requires that one who advances a particular proposition has the burden of sustaining its validity. Because the plaintiff is advancing this proposition specifically herein that the defendant St. Paul issued to plaintiff an insurance policy which did not exclude from coverage professional errors and omissions, it is the plaintiff who has the responsibility of proving evidence which leads you to believe that which the plaintiff claims is more likely true than not.

"The defendant, on the other hand, has no obligation to produce evidence with respect to plaintiff's claim. However, if you find that the plaintiff has satisfied its burden of proving coverage, it becomes the defendant's obligation to prove the applicability of any policy exclusions or limitation. Specifically, you must determine whether the defendant has produced sufficient evidence to enable the jury to conclude that a professional services endorsement was attached to the original policy when it was issued by the defendant."

We are satisfied that the language the trial justice used, that is, that the jury must conclude that the endorsement "was attached to the original policy," is not only consistent with general principles of insurance law, but also consistent with the testimony of Ms. Johnson, St. Paul's own underwriter.

A treatise, to which we have looked previously for guidance concerning the complexities of insurance law, offers the following observation:

"[An endorsement becomes] part of the [insurance] contract to the same extent as if it were actually embodied therein, provided, of course, that [the endorsement] * * * [1] has been lawfully and sufficiently *attached* to the policy, or [2] referred to in the policy, or [3] both attached and referred to in the policy * * *." 2 *Couch on Insurance* § 18:17 at 18–24–26 (Lee R. Russ, 3d ed. 2005). (Emphasis added.)

We employed similar terminology in *Textron, Inc. v. Liberty Mutual Insurance Co.*, 639 A.2d 1358 (R.I.1994). The issue before us in *Textron* was whether the insurance policy covered a particular damage-causing event. In passing upon the question, which required us to construe multiple instruments, we said, "[w]hen presented with a preprinted-form policy with various endorsements *attached* thereto, we read the two components together, with the terms of the preprinted form remaining intact except to the extent they are altered by the endorsements." *Id.* at 1362 (citing 13A John Appleman & Jean Appleman, *Insurance Law and Practice* § 7537 at 143–44 (1976)). (Emphasis added.) Furthermore, this Court repeatedly has used the word "attach" in referencing endorsements to insurance policies, the construction of which was not directly before us. *E.g., Gregelevich*, 882 A.2d at 594; *Associates in Anesthesia, Inc. v. Mutual Benefit Life Insurance Co.*, 504 A.2d 477, 478 (R.I.1986); *Columbian National Life Insurance Co. v. Industrial Trust Co.*, 53 R.I. 334, 341, 166 A. 809, 812 (1933).

The defendant has cited no case that has given vitality to an endorsement that was merely issued with, but was neither attached to nor referred to in, the underlying policy. Many jurisdictions, however, have held that an endorsement "attached" to a policy is binding as a part of the insurance contract. *See, e.g., Transamerica Insurance Co. v. Tab Transportation, Inc.*, 12 Cal.4th 389, 48 Cal.Rptr.2d 159, 906 P.2d 1341, 1343 (1995) ("The effect of attaching the endorsement to the policy * * * is to automatically incorporate the provisions of the endorsement into the policy."); *Martinez v. Hawkeye–Security Insurance Co.*, 195 Colo. 184, 576 P.2d 1017, 1019 (1978) ("An insurance policy and an endorsement attached to it must be considered as a single instrument * * *."); *Motor Vehicle Casualty Co. v. LeMars*

*Mutual Insurance Co. of Iowa*, 254 Iowa 68, 116 N.W.2d 434, 436 (Iowa 1962) ("The general rule is that an endorsement attached to a policy is part of the contract * * *."); *Employers Mutual Co. v. Oppidan*, 518 N.W.2d 33, 36 (Minn.1994) (quoting *Bobich v. Oja*, 258 Minn. 287, 104 N.W.2d 19, 24 (1960) ("We have * * * declared on several occasions that '[t]he endorsements or riders attached to an insurance contract are part of the contract * * *.'")); *Preferred National Insurance Co. v. Docusearch, Inc.*, 149 N.H. 759, 829 A.2d 1068, 1074–75 (2003) ("[A]n endorsement attached to a policy must be read together with the entire policy."); *Penn Traffic Co. v. AIU Insurance Co.*, 99 Ohio St.3d 227, 790 N.E.2d 1199, 1204 (2003) ("When construing a general policy with an attached endorsement, * * * [w]e read the endorsement as if its terms were printed within the body of the general policy."); *Brown v. Tennessee Auto. Ins. Co.*, 192 Tenn. 60, 237 S.W.2d 553, 554 (1951) ("It is well settled that riders or endorsements qualifying or restricting the liability of the insurer attached to the face of the policy contemporaneously with its issuance to the insured, constitute a part of the policy * * *."); *Transcontinental Insurance Co. v. Washington Public Utilities Districts' Utility System*, 111 Wash.2d 452, 760 P.2d 337, 343 (1988) ("An endorsement attached to a policy * * * must be read with the policy * * *."); *Riteway Builders, Inc. v. First National Insurance Co. of America*, 22 Wis.2d 418, 126 N.W.2d 24, 26 (1964) ("The standard form plus the endorsements and riders attached thereto constitute the policy and all parts must be read together."). A few jurisdictions have held that not only must an endorsement be attached to a policy to be effective, but also that it must be clearly referred to in the body of the policy. *See, e.g., Alldredge v. Security Life & Trust Co.*, 265 Ala. 470,

92 So.2d 26, 28–29 (1956) (holding, based on an Alabama statute, that an instrument attached to an insurance policy was not part of the contract because the instrument's provisions were not plainly expressed in the policy issued); *Georgia International Life Insurance Co. v. King,* 120 Ga.App. 682, 172 S.E.2d 167, 169 (1969) (interpreting a Georgia statute to require that attached paper be referenced in the policy proper).

The First Circuit recently has addressed, without deciding upon, the incorporation of an endorsement into a policy by means of attachment under Massachusetts law. *National Union Fire Insurance Co. of Pittsburgh v. Lumbermens Mutual Casualty Co.,* 385 F.3d 47, 54 (1st Cir.2004) involved a coverage dispute over whether an exclusion in an endorsement altered the policy. The District Court had granted summary judgment in favor of the insured because " 'the relevant endorsement [was] not listed on the declaration page or the attached schedule of included forms * * *.' " *Id.* The First Circuit reversed, holding that:

> "Further evidence is needed (apart from the endorsement language itself) concerning whether the endorsement formed a part of the policy. For example, if the endorsement were physically attached to the policy when transmitted to the insured, such a physical connection could indicate that the endorsement formed a part of the policy * * *." *Id.* at 55.

In articulating its decision, the First Circuit borrowed language from a Tenth Circuit case, which held as follows:

> "It is the general rule that an endorsement or rider attached to an insurance policy becomes and forms a part of the contract; that the policy and the endorsement or rider shall be construed together; and that where the provisions in the body of the policy and those in the endorsement or rider are in irreconcilable conflict the provisions contained in the endorsement or rider will prevail over those contained in the body of the policy." *Id.* (quoting *Farmers Ins. Exchange v. Ledesma,* 214 F.2d 495, 498 (10th Cir.1954)).

Accordingly, the First Circuit remanded the case to the District Court for further factual inquiry, suggesting that "evidence of industry practice * * * might show that the endorsement and the policy were parts of the same document." *Id.*

We also observe that the record is replete with the use of the very terminology defendant now decries. Ms. Johnson, a seasoned professional in the insurance industry, repeatedly used the word "attach" when referring to defendant's custom and practice, in place in 1982, in issuing endorsements in conjunction with insurance policies. For example:

> "Q. [Defendant's Attorney]: And what's an endorsement?
>
> "A. [Ms. Johnson]: An endorsement is a form that we *attach* to the umbrella policy or to any kind of policy that would change the basic insuring agreement that is *attached* to our policy.
>
> " * * *
>
> "Q. * * * Now, can you identify that document again for us? [referring to the endorsement that St. Paul alleges was part of the 1982–1983 umbrella policy]
>
> "A. Yes. It's an endorsement that was *attached* to my policy when it was issued.
>
> " * * *
>
> "Q. What is that document?
>
> "A. That is a completed operations products exclusion endorsement that was *attached* to my umbrella policy in 1982." (Emphases added.)

Moreover, the professional services endorsement itself directs the underwriter to complete a space that states, *"ATTACHED TO AND FORMING PART OF POLICY NO."* (Emphasis added.)

It is true that this Court does not rely on a witness's chosen terminology during trial in determining the correct standard under which the trial justice should charge the jury. However, in this case, after reviewing the record and reading the jury instructions as a whole, we are satisfied that the trial justice adequately covered the substantive law. Accordingly, we discern no error in her denial of the defendant's motion for a new trial.

## Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court, to which we remand the record in this case.

Justice ROBINSON did not participate.

# A P P E N D I X

## ENDORSEMENT

*The following spaces preceded by an asterisk (\*) need not be completed if this endorsement and the policy have same inception date.*

| ATTACHED TO AND FORMING PART OF POLICY NO. | * EFFECTIVE DATE OF ENDORSEMENT | * ISSUED TO |
|---|---|---|
| 569XE6952 | | |

### EXCLUSION OF PROFESSIONAL LIABILITY OR ERRORS AND OMISSIONS

In consideration of the premium charged, it is understood and agreed that this policy does not apply to Personal Injury or Property Damage arising out of professional services rendered or which should have been rendered for others in the Insureds capacity as an Adoption & Social Welfare Agency.

Nothing herein contained shall be held to vary; alter, waive or extend any of the terms, conditions, provisions, agreements or limitations of the above mentioned Policy, other than as above stated.

*In Witness Whereof,* the Company has caused this endorsement to be signed by a duly authorized representative of the Company.

\*Agency Name and Address

_____
AUTHORIZED REPRESENTATIVE

19057  Ed. 3-69  Printed in U.S.A.