**EMPLOYERS MUTUAL COMPANY, petitioner, Appellant,**

v.

**"OPPIDAN" a/k/a Duluth Regional Care Center, Inc., Avis Skoglund–Weber, individually and as guardian of the person and estate of Robert Weber, Respondents.**

No. C0–93–757.

Supreme Court of Minnesota.

June 30, 1994.

Kay N. Hunt, Lommen, Nelson, Cole & Stageberg, P.A., Minneapolis, for appellant.

James A. Wade, Johnson, Killen, Thibodeau & Seiler, P.A., Duluth, for "Oppidan".

Robert E. Mathias, Mathias & Paul, P.A., and Gene W. Halverson, Eric D. Hylden, Halverson, Watters, Bye, Downs, Reyelts & Bateman, Ltd., Duluth, for Avis Skoglund–Weber.

## OPINION

COYNE, Justice.

While living in Oppidan House, a semi-independent living facility for retarded adults owned and operated by Duluth Regional Care Center, Inc., Robert Weber suffered a debilitating epileptic seizure. Robert and his mother, Avis Skoglund, sued Duluth Regional Care Center, Inc., on the ground set out in this allegation:

3. On May 4, 1987, Robert Weber had an epileptic seizure that was directly caused by the failure of the defendant, its agents and employees, to properly pro-

vide and administer a drug known as Dilantin.

Plaintiffs later amended their complaint to assert a claim against two employees of Duluth Regional Care Center and to change the wording of the allegation:

3. On May 4, 1987, Robert Weber had an epileptic seizure that was brought about by the negligence of Stacy Crawford and Robert Hafdahl, employees of defendant, Oppidan, in failing to assist the plaintiff in obtaining a refill of the drug known as dilantin.

Employers Mutual initiated the present action for a declaratory judgment that the claims alleged in the Weber/Skoglund action are not within the coverage of Employers' comprehensive general liability policy issued to Duluth Regional Care Center, Inc. We review the decision of the court of appeals affirming the trial court's declaration that the Employers' policy covers the claims alleged by Weber and his mother. We reverse and hold that the claims in question are not covered by Employers' comprehensive general liability policy.

Weber was born mildly retarded and suffers from a severe form of epilepsy. He lived with his mother until 1987, when behavioral problems began to cause conflict between the then 18–year–old Robert and other members of the family. Weber also wanted more independence than he had while living at home. Weber's mother discussed the matter with Robert's school social worker and two county social service workers, and they concluded that placement at Oppidan House, one of the five "Semi–Independent Living Situation" (SILS) facilities run by Duluth Regional Care Center would be suitable.

Duluth Regional Care Center serves almost exclusively the needs of mentally retarded individuals. Duluth Regional Care Center's five SILS facilities are licensed to teach the residents daily living skills and to provide counseling, guidance, training and supervision according to the resident's individual plan. Duluth Regional Care Centers provides services pursuant to a "purchase service agreement" with St. Louis County. The service description contained in that agreement provides in pertinent part as follows:

Semi-independent living services are directed at maintaining and/or improving the client's functioning level. Services may include, but are not limited to, supervision, counseling or training in the following areas.

1. Meal planning and preparation
2. Shopping
3. First aid training
4. Money management and budgeting
5. Administration of medications
6. Telephone and other public utility usage
7. Personal appearance and hygiene
8. Apartment/home maintenance and upkeep
9. Use of community emergency resources (police, fire, hospital, etc.)
10. Rights and responsibilities of community living
11. Social, recreational and transportation skills
12. Appropriate social behaviors

The SILS application asks the applicant to list the areas in which help is needed; Weber's application listed "socialization, anger, hygiene, and self-medication" as problem areas.

Duluth Regional Care Center also operates four Intermediate Care Facilities for the Mentally Retarded, which provide institutional care for more seriously handicapped persons. The environment in an Intermediate Care Facility is much more restrictive than in a SILS facility, and the services provided in an Intermediate Care Facility include the administration of medication.

Robert Weber became a resident at Oppidan House on April 23, 1987. Until a specific individualized program could be developed for Weber, a staff member was to count his Dilantin pills each day to ascertain that he took the daily dosage of four pills as directed by his prescription to control seizures. Weber took the Dilantin without assistance, but he sometimes forgot to take the pills four times a day so he often took all four of them in the morning. Weber's mother said she

told Jim Carr, the St. Louis County employee who arranged Weber's admission to Oppidan, that Weber could take his medication himself if it were ordered for him. Weber's pills were counted until Friday, May 1st. Staff members did not enter a resident's apartment unless the resident was present. The record does not disclose whether Weber was present at Oppidan at any time during that weekend until Sunday evening. About 6:15 on Sunday evening, May 3rd, Weber told Stacy Crawford, a staff member, that he had run out of medicine on Friday, May 1st. Although Weber did not directly ask for help, Crawford called his pharmacy, but it was Sunday evening and the pharmacy was closed. Crawford also left a message for Bob Hafdahl, the director of Oppidan House.

On the evening of May 4, 1987 Weber had a grand mal seizure which caused severe brain damage. Subsequently Weber has suffered other seizures, each of which worsens his condition, and his emotional problems have been exacerbated.

On May 4, 1987 Duluth Regional Care Center, Inc., was the named insured in two policies of liability insurance:

1) Western World Insurance Company, Inc., was the insurer on a policy providing professional liability coverage with a single limit of at least $500,000 and, possibly, $1,000,000, for which Duluth Regional Care Center, Inc., paid an annual premium of $7,150.

The insuring agreement of the Western World policy provides—

The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of liability arising out of any negligent act, error or omission in rendering or failure to render professional services of the type described in the description of hazard shown above, whether committed by the insured or any person employed by the insured or by others for whom the insured is legally responsible.

The description of hazards is this:

Residential Group Homes and apartments for mentally retarded individuals and soft hand care program.

2) Employers Mutual Company was the insurer on a policy providing comprehensive general liability coverage with a single limit of $1,000,000, for which Duluth Regional Care Center, Inc., paid an annual premium of $1,788.

The insuring agreement of the Employers policy states—

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay because of

Coverage A.   bodily injury or

Coverage B.   property damage

to which this insurance applies, caused by an occurrence * * *.

These definitions are set out in the policy:

"Bodily injury" means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom.

"Occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

Attached to the Employers policy is a Broad Form Comprehensive General Liability Endorsement which expressly states, "This endorsement forms a part of the policy to which attached, effective on the inception date of the policy * * *." and "This endorsement modifies such insurance as is afforded by the provisions of the policy * * *."

The endorsement modifies the policy coverage in several respects. Germane to this inquiry are the provisions of Section VII, Incidental Medical Malpractice Liability Coverage, which modify the term "bodily injury" as it is used in the policy:

The definition of **bodily injury** is amended to include Incidental Medical Malpractice injury.

Incidental Medical Malpractice injury means injury arising out of the rendering or failure to render, during the policy period, the following services.

(A) medical, surgical, dental, x-ray or nursing service or treatment or the fur-

nishing of food or beverages in connection therewith, or

(B) the furnishing or dispensing of drugs or medical, dental or surgical supplies or appliances.

This coverage does not apply to:

(1) expenses incurred by the insured for first-aid to others * * *;

(2) any insured engaged in the business or occupation of providing any of the services described under VII(A) and (B) above;

(3) injury caused by any indemnitee if such indemnitee is engaged in the business or occupation of providing any of the services described under VII(A) and (B) above.

When Weber and his mother commenced their action against Duluth Regional Care Center, Employers denied that its policy afforded coverage with respect to their claims.[1] Prior to trial of Weber's action, Weber and his mother entered into a settlement agreement with Duluth Regional Care Center and its professional liability insurer, Western World Insurance Company. They agreed that the reasonable value of the plaintiffs' claims was $2,000,000, that Western World would pay $150,000, and that "any further cause of action [would] be prosecuted exclusively against Employers." They characterized their stipulation for entry of judgment of $2,000,000 against Duluth Regional Care Center, Inc. (but which the Care Center would have no obligation to pay) as a stipulation pursuant to *Miller v. Shugart,* 316 N.W.2d 729 (Minn.1982).

Subsequently, Employers moved for summary judgment in its declaratory action. After Employers' motion was denied,[2] Weber moved for summary judgment, which the district judge granted, ruling that Duluth Regional Care Center was not engaged in the business of providing medical services or medical attention and that the policy exclusions "do not have application to the events and circumstances as claimed by Robert

Weber and Avis Skoglund," and declaring that the Employers policy provided coverage with respect to Weber's claim. The court of appeals affirmed, but on the ground that Coverage A–Bodily Injury affords coverage for Weber's claim of bodily injury caused by an occurrence. The court of appeals proceeded on the theory that Coverage A— Bodily Injury and the broad form endorsement must be read independently, as if they are two separate policies, and that the provisions and exclusions in section VII of the endorsement do not affect Coverage A—Bodily Injury.

■ We have, however, declared on several occasions that "[t]he endorsements or riders attached to an insurance contract are part of the contract, and the endorsements and the policy must be construed together. A policy and endorsements should be construed, if possible, so as to give effect to all provisions * * *." *Bobich v. Oja,* 258 Minn. 287, 294–95, 104 N.W.2d 19, 24 (1960). *See also Horace Mann Ins. Co. v. Independent School Dist. No. 656,* 355 N.W.2d 413, 418 (Minn.1984). As we have already noted, the endorsement in question unequivocally states that it forms a part of the policy and that it modifies the insurance afforded by the policy.

■ When Employers' basic policy and the endorsement are construed together, "bodily injury" means bodily injury, including "injury arising out of the rendering or failure to render * * * the furnishing or dispensing of drugs * * *." The original complaint in Weber's action asserted a claim squarely within that definition: that Weber had an epileptic seizure caused by Duluth Regional Care Center's failure to "provide and administer a drug known as Dilantin." Later the complaint was amended to state the claim as a failure to assist Weber to obtain Dilantin. The changed language, however, does not alter the gravamen of the claim—that the Care Center did not provide, furnish, or procure a supply of Dilantin. Thus, the injury is a bodily injury within the policy coverage,

---

1. It appears, however, that while reserving its rights with respect to coverage, Employers joined Western World in the defense of Duluth Regional Care Center.

2. Employers' motion was denied on the ground that there was a factual dispute about "whether or not Oppidan was 'engaged in the business or occupation of providing any of the services described.'"

but the policy provides that the coverage does not apply to an insured engaged in the business of providing a service such as furnishing or dispensing drugs. Is Duluth Regional Care Center engaged in the business of furnishing or dispensing drugs? Of course it is.

That is not to say that Duluth Regional Care Center prescribes drugs, operates a pharmacy or prepares and dispenses drugs as does a pharmacist, or that it administers drugs at Oppidan House or any of its other SILS facilities. Rather, it is to recognize that pursuant to its purchase services agreement with St. Louis County, Duluth Regional Care Center has agreed to supervise, counsel and train SILS residents in the administration of medication. That is its business, and it has undertaken for pay the obligation to furnish prescription drugs by ordering prescriptions and refills for the residents or by otherwise making sure that each resident's supply of prescribed drugs is properly maintained and replenished when exhausted. Absent that express undertaking, the law would not impose on Duluth Regional Care Center the duty toward its tenants to furnish prescription drugs or to teach the tenants how to secure prescription drugs and refills and how to administer them. Moreover, at its Intermediate Care Facilities, where it provides institutional care for more severely handicapped persons, Duluth Regional Care Center routinely administers medications. In short, Duluth Regional Care Centers is engaged in the business of furnishing drugs, and, therefore, although Employers' policy would afford coverage with respect to the general liability risks associated with the ownership and operation of the several facilities enumerated in the policy, it does not provide coverage with respect to Weber's claim.

Certainly, Duluth Regional Care Center was aware that its risk of liability as a caregiver to its mentally retarded clients was insured under a separate professional liability policy issued by Western World, for it seems to us unlikely that it escaped the notice of Duluth Regional Care Center's officers that the organization was paying a premium four times that of its comprehensive general liability insurance policy—for liability limits which may have been only half as large.

Finally, because we hold that Weber's claim is not covered by Employers' policy, we do not address the validity of the *Miller–Shugart* settlement. It may, however, be helpful to comment that the circumstances to which one looks for justification of the *Miller–Shugart* arrangement were not present here. Duluth Regional Care Center, Inc., had insurance coverage under the Western policy to a limit of at least $500,000. Western afforded Duluth Regional Care Center a defense, and Employers contends it too provided a defense.

Reversed.