# United States Court of Appeals

### For the Eighth Circuit

_____

No. 18-1063

_____

National Union Fire Insurance Company of Pittsburgh, PA; American Home Assurance Company

*Plaintiffs - Appellees*

v.

Donaldson Company, Inc.

*Defendant - Appellee*

v.

Federal Insurance Company

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: March 13, 2019
Filed: June 14, 2019

_____

Before SHEPHERD, ARNOLD, and ERICKSON, Circuit Judges.

_____

ERICKSON, Circuit Judge.

This case involves an insurance coverage dispute over the allocation of a $6 million settlement in an underlying product liability lawsuit. Defendant-Appellee Donaldson Company, Inc. ("Donaldson"), a designer and manufacturer of defective air ducts, was insured under consecutive commercial general liability ("CGL") policies from two subsidiaries of AIG Property Casualty U.S., Inc., specifically Plaintiffs-Appellees National Union Fire Insurance Company of Pittsburgh, PA and American Home Assurance Company (individually "National Union" and "American Home," and collectively "AIG"). Donaldson was also insured under consecutive umbrella policies issued by Defendant-Appellant Federal Insurance Company ("Federal").

In a series of orders, the district court[1] construed the terms of the insurance policies; determined the parties' obligations under the policies; and ruled that AIG be paid $500,000 by Donaldson and be reimbursed over $2.76 million by Federal. Federal appeals, asserting the district court erred in its interpretation of the Batch Clause Endorsement and its construction of the term "lot." We affirm.

## I.     Background

### A.     Underlying Product Liability Suit

During the 1990s, Donaldson designed and manufactured two types of plastic ducts exclusively for the air-intake system of trucks manufactured by Western Star Trucks ("Western Star"): a "crossover" duct (product number 317) and an "elbow" duct (product number 319). These trucks were used in the logging and construction

_____

[1]The Honorable John R. Tunheim, Chief Judge, United States District Court for the District of Minnesota.

industries. When functioning properly, the air-intake system delivered clean air into the internal parts of Western Star diesel truck engines.

In January 2000, a Western Star representative informed Donaldson that three trucks had experienced engine dusting because of a defect in both types of ducts. In 2001, purchasers of Western Star trucks began filing lawsuits alleging a design defect. More specifically, the claims alleged the ducts' walls were too thin, which caused the ducts to soften and melt and eventually cause engine dusting and engine failure. In a lawsuit filed in Mississippi state court, Arender v. Burroughs Diesel, Inc., fifteen purchasers of Western Star trucks sued Donaldson, Western Star, and a commercial dealer of the trucks, Burroughs Diesel, Inc. ("Burroughs"), alleging the Western Star trucks they purchased were inoperable due to the air-intake system. Burroughs filed a cross-claim against Donaldson. In 2010, the Burroughs cross-claim settled for $6 million (the "Burroughs settlement"), in which AIG contributed $3,548,387.10 and Federal contributed $2,451,612.90. Both insurers reserved their rights to challenge the apportionment of the settlement.

Donaldson notified AIG—or at least American Home—of the complaints regarding the air-intake ducts shortly after they were filed. On March 11, 2002, a claims management analyst for AIG Vendor Services sent a letter to Donaldson's third-party claims administrator, stating:

> . . . We recently learned that the insured carried a Batch Clause Endorsement on their policy, therefore, all claims related to alleged faulty air intake systems on Western Star trucks would fall under one occurrence. All of the claims are subject to one deductible, and the limits of insurance for this occurrence are $1,000,000.
>
> We have reopened our file. Per the Batch Clause Endorsement, we have created a date of loss of November 14, 2001, the date on the first summons received by the insured. We have also combined the Arender and Bonner lawsuits under one claim number, []. We suggest

that you take similar steps regarding the date of loss and combination of all claims into one.

* * *

This matter has the potential to exceed the policy limit of $1,000,000, therefore, the umbrella and excess carriers have been placed on notice.

In May 2002, the claims management analyst for AIG Vendor Services, on behalf of American Home, informed Donaldson that it had analyzed the 2001-2002 policy and it would defend Donaldson "subject to a full reservation of all of its rights under the policy, and to decline coverage to [Donaldson] should there be a future determination that there is no potential for coverage." American Home also noted that providing a defense "shall not act as an estoppel or waiver of any of the rights arising out of the policy or law." Finally, American Home informed Donaldson that it should submit claims for coverage under different policies separately.

In June 2003, National Union's claims administrator sent Donaldson a letter reserving its rights to deny coverage for the damages alleged in the Arender Complaint (the Burroughs action) and Bonner Complaint on the ground that the damages manifested prior to the inception of the umbrella liability policy insuring Donaldson.

*B. Insurance Policies*

1. AIG Commercial General Liability Policies

Donaldson was insured under AIG policies for six consecutive policy periods. National Union issued four CGL policies to Donaldson effective for the consecutive annual policy periods from July 31, 1996, to July 31, 2000. American Home issued two consecutive CGL policies to Donaldson for the annual policy periods from July

-4-

31, 2000, to July 31, 2002. The relevant terms at issue in each CGL policy are identical.

Each policy contains a $1 million per-occurrence limit and a $500,000 per-occurrence deductible for "property damage." The policies require AIG to pay for "property damage" under the following terms:

**1.** **Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. . . .

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

**(2)** The "bodily injury" or "property damage" occurs during the policy period.

"Property damage" is covered under the policies if caused by an "occurrence." "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Property damage" is separated into two distinct categories:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

At the heart of the dispute is a Batch Clause Endorsement, which provides:

**Section V. - Definitions, 13. - Occurrence,** is amended to add new paragraph:

As respects "Products Completed Operations Hazard", all "bodily injury" or "property damage" arising out of and attributable directly or indirectly to the continuous, repeated or related exposure to substantially the same general conditions affecting one lot of goods or products manufactured, sold, handled or distributed by you or others trading under your name, shall be deemed to result from a single "occurrence." Such "occurrence" will be deemed to occur with the first injury notified to you during the policy period.

With exceptions not relevant in this case, the policies define "products-completed operations hazard" to include "all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work.'"[2]

## 2. Federal Umbrella Policies

Donaldson was insured under five Federal umbrella policies, effective for the consecutive annual policy periods from July 31, 1996, to July 31, 2001. The Federal policies provide $40 million of excess coverage under the following conditions:

---

[2]It is undisputed that this case involves damage falling under the "products-completed operations hazard."

Under Coverage A, we will pay on behalf of the **insured**, that part of **loss** covered by this insurance in excess of the total applicable limits of **underlying insurance**, provided the injury or offense takes place during the Policy Period of this policy.  The terms and conditions of **underlying insurance** are with respect to Coverage A made a part of this policy, except with respect to:

A.      any contrary provision contained in this policy; or

B.      any provision in this policy for which a similar provision is not contained in **underlying insurance**.

With respect to the exceptions stated above, the provisions of this policy will apply.

The Federal policies are silent about the underlying AIG policies' Batch Clause Endorsement.

### C.      District Court Proceedings

In 2010, AIG brought this action against Donaldson and Federal seeking to recover amounts AIG contributed to the Burroughs settlement.  Federal filed a counterclaim against AIG and a cross-claim against Donaldson, and Donaldson counterclaimed against both insurance companies.  Over the course of several years, the district court issued a series of five orders deciding various motions.  Only three of these decisions are relevant to this appeal: the first two summary judgment orders (referred to as Donaldson Order I and Donaldson Order II) and the order granting entry of judgment (referred to as Donaldson Order V).

In Donaldson Order I, the district court interpreted the Batch Clause Endorsement and found the clause "unambiguously combines property damage, including damage that may take place across multiple policy periods, into one 'occurrence' that takes place when Donaldson is notified of that damage."  Nat'l

Union Fire Ins. Co. of Pittsburgh, PA v. Donaldson Co., Inc. ("Donaldson Order I"), No. 10-4948 (JRT/AJB), 2012 WL 1072329, at *12 (D. Minn. Mar. 30, 2012). The court reasoned, in part, that the Batch Clause Endorsement "artificially bundles property damage into one 'occurrence' that 'occurs'" when Donaldson is notified of an injury to the property because "an 'occurrence' that **causes** an injury cannot, in reality, 'occur' after the injury **already exists** and is known to Donaldson." Id. at *12 n.20. The court, in construing the plain language of the Batch Clause Endorsement, found that coverage existed under a policy period if the required notice was received during that policy period. Id. at *12. Whether or not actual injury occurred during the policy period was immaterial in the court's view. Id. The court determined that the number of policy years and deductibles implicated would depend on the number of product "lots" involved. Id. at *12 n.21. In making these findings, the court rejected the argument that the Batch Clause Endorsement only combines injuries that take place during an individual policy year into a single "occurrence." Id. at *12.

The district court's order also addressed the definition of the term "lot" as contained in the Batch Clause Endorsement. Id. at *14. Looking to dictionary definitions, the court found that "'lot' likely applies to each type of unique product as a distinct group, kind, or sort." Id. The court noted that the "ducts at issue may have included products with different specifications, product numbers, and base materials" and that "[w]hile the term 'lot' potentially applies to each type of unique product designed and manufactured by Donaldson, the term would not apply to products with distinctive qualities that cannot reasonably constitute a group, kind, or sort." Id.

In Donaldson Order II, the court decided cross-motions for summary judgment regarding how many "lots" were involved in the Burroughs settlement. Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Donaldson Co., Inc. ("Donaldson Order II"), No. 10-4948 (JRT/TNL), 2015 WL 1292561, at *9. (D. Minn. Mar. 23, 2015). Donaldson asserted that one or, at most, two lots were at issue and, under the Batch Clause

Endorsement, each lot corresponded to one "occurrence" that involved only the 1999-2000 policy period. Id. Federal contended there were "no fewer than 22 aggregated-by-lot occurrences" based on notice to Donaldson on seven occasions during the 1999-2000 policy period, ten occasions during the 2001-2002 policy period, and five occasions during the 2009-2010 policy period. Id. at *10.

Rejecting a technical definition of "lot" proposed by Federal and applying the definition from Donaldson Order I, the court found there were two "lots" of ducts responsible for the damage in Burroughs. Id. at *10–12. The court reasoned that the ducts with product numbers 317 and 319 were similar but "differences in their product numbers, specifications, and base materials are significant enough to treat each as a distinct group, kind, or sort, and, therefore, a separate lot." Id. at *10. "Within each product's manufacturing history, however, the numbers, specifications, and base materials have remained the same." Id. at *11. The court noted that although the ducts' chemical composition had always remained identical, in 1999 the factory producing the ducts altered the particle size of the powder form that went into the product mold and this was a change in base material. Id. The court found that this change in particle size was irrelevant to the "lot" determination. Id. at *11 n.11.

Having determined two "lots" were involved in the Burroughs settlement, the court addressed the related issue of when Donaldson received notice of the "property damage." Id. at *12. It was undisputed that Donaldson was first notified of damage related to both "lots" in January 2000 when the Western Star representative contacted Donaldson. Id. Accordingly, all "property damage" related to each of the two "lots" constituted an "occurrence" within the 1999-2000 policy period, for a total of two "occurrences." Id.

In Donaldson Order V, the court granted AIG's motion for entry of judgment against Federal and Donaldson. Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Donaldson Co., Inc. ("Donaldson Order V"), No. 10-4948 (JRT/TNL), 2017 WL

6210915, at *7 (D. Minn. Dec. 6, 2017). The court found that, because there were two "occurrences," two $500,000 per-occurrence deductibles applied to the <u>Burroughs</u> settlement, which was allocable to the 1999-2000 AIG Policy. <u>Id.</u> Of the $6 million settlement, the court allocated $785,591.44 to the 1999-2000 AIG policy and $5,214,408.56 to the 1999-2000 Federal Excess Policy. <u>Id.</u> Because Donaldson previously paid one $500,000 deductible, the court ordered Donaldson to pay AIG an additional $500,000 to satisfy its obligations. <u>Id.</u> Because Federal previously paid only $2,451,612.90 toward the settlement, Federal was ordered to reimburse AIG $2,762,795.66. <u>Id.</u> The court entered judgment accordingly. Federal timely appealed.

## II.     Discussion

### A.     Standard of Review

We review *de novo* the district court's grant of summary judgment and its interpretation of Minnesota insurance law. <u>Grinnell Mut. Reinsurance Co. v. Schwieger</u>, 685 F.3d 697, 700 (8th Cir. 2012) (quoting <u>Pioneer Indus. v. Hartford Fire Ins. Co.</u>, 639 F.3d 461, 465 (8th Cir. 2011)). Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." <u>Id.</u> (quoting Fed. R. Civ. P. 56(a)).

"Under Minnesota law, interpretation of an insurance policy . . . is a question of law to be decided by the court." <u>Id.</u> at 701. Policy interpretation follows "general principles of contract construction, giving effect to the intent of the parties." <u>Volk v. Ace Am. Ins. Co.</u>, 748 F.3d 827, 828 (8th Cir. 2014) (citing <u>Thommes v. Milwaukee Ins. Co.</u>, 641 N.W.2d 877, 879 (Minn. 2002)). We give unambiguous terms their plain and ordinary meaning. <u>Id.</u> (citing <u>Thommes</u>, 641 N.W.2d at 880). Ambiguous policy language is to be resolved in the insured's favor. <u>SECURA Supreme Ins. Co. v. M.S.M.</u>, 755 N.W.2d 320, 323 (Minn. Ct. App. 2008) (citing

Marchio v. W. Nat. Mut. Ins. Co., 747 N.W.2d 376, 380 (Minn. Ct. App. 2008)). "This is done by interpreting the ambiguity in accordance with the reasonable expectations of the insured." Id. (citing Carlson v. Allstate Ins. Co., 749 N.W.2d 41, 47–48 (Minn. 2008)). Ambiguity exists when policy language is "reasonably subject to more than one interpretation." Volk, 748 F.3d at 828 (quoting Columbia Heights Motors, Inc. v. Allstate Ins. Co., 275 N.W.2d 32, 34 (Minn. 1979)).

Insurance policies "must be read as a whole," and "[p]rovisions in a policy must be read in context with all other relevant provisions." Commerce Bank v. W. Bend Mut. Ins. Co., 870 N.W.2d 770, 773 (Minn. 2015) (citations omitted). "[E]ndorsements . . . attached to an insurance contract are part of the contract, and the endorsements and the policy must be construed together." Employers Mut. Co. v. Oppidan, 518 N.W.2d 33, 36 (Minn. 1994) (quoting Bobich v. Oja, 104 N.W.2d 19, 24 (Minn. 1960)). Provisions limiting liability are construed against the insurer. Thommes, 641 N.W.2d at 880 (citations omitted).

## B.    Number of Policy Periods Triggered

Federal challenges the district court's interpretation of the Batch Clause Endorsement and corresponding finding that only the 1999-2000 policy period was triggered. Federal argues the court ignored the plain language of the insuring agreements in the CGL and umbrella policies, which provide that "property damage" or "injury" is covered only if it occurs or takes place during the policy period. We find Federal's arguments unpersuasive.

The Batch Clause Endorsement amends "occurrence" as follows: (1) all "property damage" that "aris[es] out of and [is] attributable directly or indirectly to the continuous, repeated or related exposure to substantially the same general conditions affecting one lot of goods or products manufactured, sold, handled or distributed by" the insured is "deemed to result from a single 'occurrence.'" The

second part of the paragraph provides that the "occurrence" is "deemed to occur with the first injury notified to [the insured] during the policy period." Federal argues that this endorsement has no effect on the timing requirement set forth in the CGL policies' coverage sections as to when the policies cover "property damage." In other words, Federal contends that the "property damage" must occur during the policy period regardless of the language in the endorsement.

There are several problems with Federal's interpretation. First, it fails to give meaning to the plain language of the endorsement as a whole. Combining each provision in the endorsement leads to a single unambiguous interpretation: All "property damage" affecting a defective "lot of goods or products" is consolidated into a single "occurrence" deemed to occur when the insured is first notified during the policy period. Federal's interpretation renders meaningless the endorsement by placing a claim in one policy period while assigning the "property damage" to another.

Second, it conflicts with the main purpose of batch clauses, which is "to reduce the number of occurrences whenever the same product causes multiple bodily injuries or property damage." Michael Murray, Note, The Law of Describing Accidents: A New Proposal for Determining the Number of Occurrences in Insurance, 118 Yale L.J. 1484, 1539 (2009) (cleaned up); see also Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co., 609 A.2d 440, 480 (N.J. Super. Ct. App. Div. 1992) ("The intent of the parties in adding the batch clause to the policies was to minimize the number of occurrences in order to maximize coverage."). Under Federal's approach, an insurer would be permitted to break the single "occurrence" created by the endorsement into multiple "occurrences" (i.e., one "occurrence" in each policy period in which a truck is damaged by a duct from the same "lot"). This result not only runs contrary to the purpose of batch clauses, but also would open the door to expensive coverage disputes when a defective product is at issue and multiple insurers are

-12-

involved. It also poses a risk that gaps in coverage will exist if, for example, there is a policy period where the insured received no notification of damage.

Finally, Federal's interpretation violates a cardinal insurance policy interpretation rule—limitations of liability are to be construed against the insurer. The "property damage" provision in the coverage section limits liability. The court construes limitations against the insurer. To the extent the endorsement creates a conflict with the body of the policy, the endorsement provisions must govern. Grinnell Mut. Reinsurance Co., 685 F.3d at 701 (citing Bobich, 104 N.W.2d at 24).

Upon applying Minnesota's rules for interpreting insurance policies and considering the policies' unambiguous terms, we find that when a defective "lot" of goods or products is involved, the claims are consolidated into a single "occurrence" deemed to occur on the date the insured first received notice of the injury during the policy period. Damage that takes place across multiple policy periods is to be combined into a single "occurrence" so long as it "aris[es] out of and [is] attributable directly or indirectly to the continuous, repeated or related exposure to substantially the same general conditions affecting one lot of goods or products manufactured, sold, handled or distributed by [the insured] or others trading under [the insured's] name."

Federal further argues the district court erred in entering judgment against it because the underlying injuries in the Burroughs settlement did not all factually occur during the policy period of its 1999-2000 umbrella policy. As Federal points out, its policy includes the phrase "provided the injury or offense takes place during the Policy Period of this policy"—which mirrors the AIG policy's timing clause. The Federal umbrella policy, however, is a follow form policy that incorporates the terms and conditions of the underlying AIG policy, including its endorsements, with two limited exceptions: (1) "any contrary provision contained in [the Federal] policy" or

(2) "any provision in [the Federal] policy for which a similar provision is not contained in [the AIG policy]."

Because the Federal umbrella policy is not inconsistent with the AIG policy, we will not read an implied invalidation of the Batch Clause Endorsement into the umbrella policy. A decision that requires actual injury to occur during the policy period would contradict the plain language of the Batch Clause Endorsement.

## C. Definition of "Lot"

Federal contends the district court improperly inserted a subjective element into the definition of "lot" via Donaldson Order II's footnote 11—that a change to a product distinguishes a new "lot" only if the change is "relevant to [the] litigation" at hand. Federal does not challenge the definition of "lot" set forth in Donaldson Order I. Instead, Federal argues that, had the district court applied the original objective definition, a finding of a minimum of four "lots" would have been necessary.

Federal has not established the district court erred when making the "lot" determination. Donaldson makes unique products tailored to individual companies like Western Star. A "lot" applies to each type of unique product designed and manufactured by Donaldson. The minor change in particle size had no bearing on whether a new type of unique product was formed. There were two different types of ducts uniquely designed for Western Star trucks. These two types of ducts were given the same product numbers before and after the particle size change. The molds used to manufacture the ducts did not change, nor did the ducts' conformity with design drawings and manufacturing specifications. The ducts remained "chemically identical" with the same type of plastic still in use after the change in particle size. The change itself had nothing to do with Donaldson. Donaldson's contract manufacturer made the change universally after identifying fill problems that only

existed with certain non-Donaldson parts. This minimal change with no effect on the functioning, specifications, product numbers, appearance, or quality of the two types of uniquely tailored ducts did not produce a new product with distinctive qualities. Accordingly, two "lots" were implicated.

## III.    Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

ARNOLD, Circuit Judge, concurring in part and dissenting in part.

I concur in the part of the court's opinion disposing of Federal's argument regarding the number of "lots" at issue in this case. But I respectfully disagree that the batch clause endorsement aggregates occurrences across different policy periods, and, for that reason, I would reverse the district court's judgment and remand for further proceedings.

The court gives three reasons for its interpretation of the batch clause endorsement, but none of them is ultimately persuasive. The court says that Federal's argument—that the batch clause endorsement does not combine occurrences across policy periods—doesn't square with the plain language of the endorsement, but it never explains how that is so; it merely concludes that "a single unambiguous interpretation" exists. The court appears to support that conclusion by stating that "Federal's interpretation renders meaningless the endorsement by placing a claim in one policy period while assigning the 'property damage' to another." But that interpretation hardly makes the batch clause endorsement meaningless—the batch clause endorsement still aggregates claims within a single policy period, so it continues to have work to do. And there is nothing inherently illogical about an occurrence occurring at a time different from when property damage occurs. In fact, we have recognized that an occurrence and its resulting injury "need not have any

-15-

relationship to each other in time or place." *See Diocese of Winona v. Interstate Fire & Cas. Co.*, 89 F.3d 1386, 1390 n.5 (8th Cir. 1996); *see also Singsaas v. Diederich*, 238 N.W.2d 878, 882 (Minn. 1976).

Similarly, the court asserts that Federal's interpretation of the batch clause endorsement conflicts with the purpose of a batch clause, which, the court rightly says, is "to reduce the number of occurrences whenever the same product causes multiple bodily injuries or property damage." But the batch clause endorsement fulfills that function under Federal's interpretation too. For example, the court points out that Donaldson received notice of property damage on seven occasions during the 1999–2000 policy period. Assuming each of those notices pertained to the same lot of goods, the batch clause endorsement would reduce those seven occurrences to one. It simply wouldn't reduce to a single occurrence all of the property damage relating to that lot of goods across different policy periods. In other words, just because, under Federal's interpretation, the batch clause endorsement doesn't reduce every claim regarding a lot to a single occurrence doesn't mean that the batch clause endorsement isn't fulfilling its purpose. As one court explained, "While it is indisputable that the parties intended by the 'one lot' clause to aggregate claims in some fashion, it does not follow that the parties intended that claims would be aggregated to most effectively limit the insurer's liability. Rather, the clause's language suggests that the parties intended to aggregate only some claims." *London Mkt. Insurers v. Superior Court*, 53 Cal. Rptr. 3d 154, 171 (Cal. Ct. App. 2007).

Finally, the court adverts to the principle that, when interpreting an insurance policy, we should construe limitations on the insurer's liability in the insured's favor. But that principle does not come into play where the policy is clear and unambiguous; instead we must give clear and unambiguous language its ordinary meaning. *See Westfield Ins. Co. v. Robinson Outdoors, Inc.*, 700 F.3d 1172, 1175 (8th Cir. 2012). The policy here says quite plainly that the policy applies to property damage only if the property damage "occurs during the policy period." The umbrella policy likewise

-16-

applies "provided the injury or offense takes place during the Policy Period." Nothing in the batch clause endorsement undercuts these statements. Had the parties intended for that endorsement to do so, all they had to say in that endorsement was that "'property damage' will be deemed to occur with the first injury notified to you during the policy period," but it instead says that an "'occurrence' will be deemed to occur" at that time. The parties knew perfectly well how to draft the clauses so property damage could be deemed to have occurred at the same time as an occurrence: In defining the loss of use of tangible property that is not physically injured, the policy specifically provided that such loss "shall be deemed to occur at the time of the 'occurrence' that caused it." The drafters could have sounded a similar note in the batch clause endorsement had they intended property damage and occurrence to be synonymous. They did not.

Based on my reading of the policy as a whole, I would hold that the batch clause endorsement aggregates claims only within a policy period and not across policy periods. I would therefore remand the case for the district court to determine how many policy periods are implicated with this understanding of the batch clause endorsement in mind, and to recalculate the award accordingly.

———————————————